Douglas SMERDON, Administrator Estate of David H. Barnes,
Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. A. No. 54–474.

United States District Court
D. Massachusetts.

Nov. 18, 1955.

Douglas Smerdon, administrator estate of David H. Barnes, pro se.

Thomas H. Mahony, Russell J. Coffin, Boston, Mass., for plaintiff.

Andrew A. Caffrey, Asst. U. S. Atty., James P. Lynch, Jr., Lawrence Urbano, Boston, Mass., for defendant.

SWEENEY, Chief Judge.

This is an action brought under the Federal Tort Claims Act, Title 28, U.S. C.A. § 1346(b). The case was heard on the question of liability alone in the first instance as counsel indicated that the evidence and the question of damages would be rather lengthy. I do not feel that the case is close enough to warrant the expenditure of money necessary to take evidence at this time. If the Court is wrong in this view, it can be taken later just as well.

### Findings of Fact

The plaintiff is the Administrator of the Estate of David H. Barnes. On the morning of November 23, 1953, Barnes was a passenger on an airplane owned by Old Colony Aviation, Inc., flown by one Forrest V. Smith. A third person Albert West, was a passenger in the plane. The flight originated at Martha's Vineyard and proceeded to Logan International Airport, Boston. Smith filed a flight plan for instrument flying with Nantucket Radio Station prior to his take-off. The plane, a Beechcraft Bonanza, was a four-place low-wing monoplane, having a full flight panel, capable of navigating on instruments, and had retractable landing gear. Smith was a pilot of considerable experience, having been trained by the Navy, during which service he earned a certificate of proficiency at instrument flying. At the time of this flight he had logged approximately six hundred hours of instrument flying among his thirty-five hundred hours in the air.

Smith took off at 10:16 A.M. and completed the first leg of his flight when he arrived over Hyannis, and then proceeded in the direction of Boston. The Approach Control Center in Boston is an operating part of the Air Traffic Control Service established by the Administrator of Civil Aeronautics, acting under the authority of Title 49 U.S. C.A. At approximately 11:00 A.M., the Boston Approach Control Center established radio communications with the plane when it was in the area of the Squantum Naval Air Station. Smith was advised to hold his position at Squantum at an altitude of 6,000 feet. Approach Control had notice of Smith's having filed an Instrument Flight Rule plan (IFR). The Approach Control was controlling four or five other aircraft in different sectors to prevent their collision, until such time as they could commence landing. Weather conditions at Logan Airport were such that visibility in the area of the tower where Air Traffic Control was located was extremely poor and below the minimums for Visual Flight Rules (VFR) to control. During this time all planes, including Smith's, were advised that the visibility at the field itself was three-eighths of a mile as determined by the Boston Weather Bureau. When the Control Center asked Smith what type of an approach he would make he requested from them a Ground Controlled Approach. The Control Center answered that they were unable to furnish a ground controlled approach due to precipitation clouding the scope of its precision radar equipment. At this point Smith was approximately six miles from the Airport. Approach Control then furnished for all planes holding at Boston the weather conditions at Bedford Airport, which were well above the minimum for Visual Flight Rules approach and landing. When Smith heard this report he mistook it for a report of the Boston Airport weather conditions, and radioed the Approach Control Center that he held visually the Squantum Naval Air Station, a point some six miles southwest of Logan; Deer Island and Long Island, two islands in Boston Harbor southeast of Logan, about two miles distant; and there was unrebutted evidence that Smith reported seeing the end of one runway at Logan Airport itself. Smith believed that any obscuration he observed on the harbor was thin, and would be a temporary impediment to visibility. Based upon his mistaken impression coupled with his own observation he requested Visual Flight Rules clearance to enter an approach for land-

ing at Logan Airport. Boston Approach Control Center cleared Smith to make his approach in an air corridor, heading north by northwest. Smith was advised that winds were calm, so that he could use any runway for his actual landing. He left his previously assigned altitude and approached the field at an altitude of five hundred feet. While on his glide path he was in constant radio communication with the Control Tower and was advised of his distance from the field and his relative position to the runways as his plane approached. During his approach Smith let down his landing gear from their retracted position. This caused a drag on the plane and would cause the nose of the plane to dip, if this drag were not countered by trimming the horizontal stabilizers or drawing them up by pulling back on the yoke. Whether this drag was actually countered was not established. When the plane was a half mile from the end of the runway Smith entered an area of fog, but believed it to be a temporary obscuration. At this point his visibility was from fifty to one hundred feet. The fog did not pass as Smith expected. At approximately 11:39 A.M., the plane crashed into the waters of Boston Harbor. The pilot Smith and passenger West escaped the plane before it sank. The plaintiff's decedent, Barnes, drowned as a result of the crash.

While the plane was under the control of the Control Center the personnel exercising control did not have visual access to the field. They are located inside a canvas tent for the accommodation of radar viewing, and they receive and transmit weather information based upon official U. S. Weather Bureau reports. In granting Visual Flight Rules approach the Approach Control Center issued instructions to insure that there would be no danger of collision with other aircraft under its control.

 In order to sustain his burden of proving by a preponderance of evidence that the government was negligent, the plaintiff must establish that the government's employees were negligent in the performance of their operational duties, and that such negligence was the proximate cause of the injury complained of. The case of Eastern Air Lines, Inc., v. Union Trust Co., D.C. Cir., 221 F.2d 62, is persuasive in determining that Congress has consented for the government to be sued for damages resulting from the negligence of its tower operators acting within the scope of their employment.

Title 49 U.S.C.A. § 551, authorizes the Civil Aeronautics Board and the Administrator of Civil Aeronautics to prescribe: (a) (7).

"Air traffic rules governing the flight of, and for the navigation, protection, and identification of, aircraft, including rules as to safe altitudes of flight and rules for the prevention of collisions between aircraft, and between aircraft and land or water vehicles."

Part 617 of Title 14, C.F.R., contains the specific rules governing the question of negligence before the Court. This section contains the Air Traffic Control Rules affecting the operation of an air traffic control center or tower by personnel certified by the Civil Aeronautics Administration as air traffic control operators. Section 617.4 of Title 14 C.F.R. defines the objective of the Air Traffic Control Service:

"The primary objective of the air traffic control service shall be to promote the safe, orderly, and expeditious movement of air traffic. This shall include: (a) Preventing collisions between aircraft and between aircraft and obstructions on the movement area. (b) Expediting and maintaining an orderly flow of air traffic. (c) Assisting the person in command of an aircraft by providing such advice and information as may be useful for the safe and efficient conduct of a flight * * *."

The plaintiff's theory of liability is reliant upon subsection (c) of this section. He argues that the Air Traffic Control operator had a duty to assist Smith and his passengers by providing advice and information to help him land safely, and that the defendant's employee failed this duty by authorizing a Visual Flight Rules landing in an area where visibility was unsafe to permit such a landing. The defendant argues that the limits of the Air Traffic Control operator's duties are to clear aircraft to enter a control area, based upon the prevention of collisions in the air, or danger of collision to an aircraft from an obstruction on the movement area.

The rules governing the control of aircraft flying in a control area are designed to prevent collisions between aircraft approaching a focal point, viz., the landing field, and to prevent a landing or departing aircraft from striking an obstacle or depression on the surface of the movement area. Part 617, Subpart B, Code of Federal Regulations, defines the various rules for preventing such collision in the air or on the ground by dictating to air traffic control operators the requisites to be met under either VFR or IFR visibility conditions in granting an aircraft proper entry to a control zone. The aircraft in question was properly controlled according to these prescriptions, insofar as its safety from collision was concerned. Beyond this, the plaintiff urges that Part 60, 14 C.F.R. applies to the conduct of the aircraft control operator in controlling the movements of aircraft in his control area. In particular, he relies on §§ 60.30, and 60.31, which require that a pilot be cleared to enter a control zone before entering and landing, when certain conditions of visibility prevail. These sections are directions to a pilot, and define his responsibilities relative to the established procedure under which the Air Traffic controller operates to separate aircraft one from another and from obstacles on the surface of the movement area.

■ From inspection of Part 617, Title 14, C.F.R. it is concluded that these regulations are designed for use by the Air Traffic Control operator in order for him to maintain aircraft within his control area safe from collision with one another, and from danger arising from obstacles on the surface of the movement area, such as other moving aircraft, construction vehicles, and facilities, or depressions in the surface of the runway, and the like. Their duties do not go as far as the plaintiff urges. These regulations do not place upon Air Traffic Control operators the responsibility of determining whether or not a given weather condition is safe for a landing. The operator's duty in this case was limited to maintaining control of the airways to prevent collision between aircraft under his control.

The evidence here bears out the practicability of the proposition that the before-enumerated sections of Part 60, C.F.R., pertaining to Instrument Flight Rules and Visual Flight Rules minimum allowances of visibility, are to guide the pilot in determining his conduct when approaching a control area which is apt to be congested. In this case Smith furnished the information to the Logan Tower operator that from where he was flying visibility was within the minimum for VFR. The tower operator had furnished and continued to furnish the official Boston Weather Bureau reports to indicate that at the field the weather was below the minimum for VFR. It was not his responsibility to dispute Smith's visibility, but to assist Smith to land his plane safely and expeditiously. Smith decided that he could make a safe approach and landing, and for his part the tower operator undertook to keep all other planes from the air corridor selected by Smith.

## Conclusions of Law

■ I rule that in the performance of his official duties the tower operator who was controlling aircraft at the time of this occurrence at Logan In-

ternational Airport was not negligent in the performance of his duties toward the plaintiff's intestate in permitting the pilot Smith to enter his control area for the purpose of making a landing. Judgment must be entered for the defendant. In view of this decision, it is unnecessary to pass upon the Defendant's Motion to Dismiss.