Elizabeth Anne ROWE, Administratrix of the Estate of Duane A. Rowe, deceased, and Rita C. Smith, Administratrix of the Estate of William Lee Smith, Deceased, Plaintiffs,

v.

The UNITED STATES of America, Defendant.

Civ. A. No. 62–013.

United States District Court
W. D. Pennsylvania.

March 2, 1964.

Bruce Martin, Pittsburgh, Pa., for plaintiffs.

Philip Silverman, Atty., Dept. of Justice, William Kraham, Atty., Federal Aviation Agency, Washington, D. C., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MARSH, District Judge.

This litigation is grounded upon the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq., and arises out of the deaths on January 8, 1961, of Duane A. Rowe and William Lee Smith who perished when a single-engine Cessna Model 180 aircraft in which they were passengers crashed during a radar-assisted approach to Greater Pittsburgh Airport in this District. The aircraft, Register No. N5138E, was owned by the Kullberg Drilling Company, Inc. and piloted by one Richard Robert Kullberg.[1]

Plaintiffs, the widows of Rowe and Smith, seek to recover damages against the United States on behalf of themselves and their children, and on behalf of their late husbands' estates, in accordance, respectively, with the Wrongful Death[2] and Survival[3] Acts of Pennsylvania.

## CONTENTIONS OF PARTIES

The parties agree that the Cessna sustained in-flight breakup prior to crashing. Defendant contends that the breakup was due to the application to the aircraft of heavy aerodynamic forces most probably encountered while the aircraft descended out of control in a high-speed spiral; that the pilot lost control when he became disoriented upon entering a solid overcast and losing his visual references therein. Plaintiffs contend that the Cessna's breakup resulted either from pilot disorientation or from paralysis or malfunctioning of flight controls caused by an encounter with icing conditions; that, in either event, negligence of the defendant's employees was the proximate cause of the crash.

Plaintiffs allege various acts of negligence on the part of Federal Aviation Agency (F.A.A.) employees of the defendant, to-wit: that the Controller at Midway Airport in Chicago failed to transmit to the Flight Service Station at Pittsburgh, and/or to the Approach Controller at Greater Pittsburgh Airport (GPA), a visual flight plan filed by Kullberg prior to take-off from Midway; that Approach Control at GPA gave the Cessna compass headings and descent clearance "in utter disregard of the fact, which was known to the Approach Controller, that the pilot, following his direction would fly into conditions where he would encounter the risk of disorientation and of icing"[4]; that defendant failed to promulgate any procedure in its manual for air controllers which would instruct them in the furnishing of radar assistance to visual flight pilots; and that Approach Control at GPA failed to direct the pilot to a safer airport.

Defendant denies that any of its employees breached duties owed to plaintiffs' decedents in the circumstances of this case, and, in any event, denies that

1. Pretrial Stipulation, p. 4. Kullberg also died in the crash, and the evidence before us concerning the cause of the crash is therefore entirely of circumstantial and opinion nature.

2. 12 Purdon's Pa.Stat.Ann. § 1601 et seq.

3. 20 Purdon's Pa.Stat.Ann. § 320.601 et seq.

4. Plaintiffs' Preliminary Requests for Findings of Facts, p. 2.

any alleged negligent act or omission by its employees was a proximate cause of the Cessna's crash.

After trial to the court without a jury, 28 U.S.C. § 2402, we make the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1. The plaintiffs are the duly appointed administratrices of their decedents' estates.

2. As said administratrices, plaintiffs seek to recover damages in this action in behalf of themselves and their children, and in behalf of their decedents' estates, under 12 Purdon's Pa.Stat.Ann. § 1601 et seq. and 20 Purdon's Pa.Stat.Ann. § 320.601 et seq., which statutes are, respectively, the Wrongful Death and Survival Acts of the Commonwealth of Pennsylvania.

3. This action is brought pursuant to the provisions of the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq., for damages allegedly caused by negligent and wrongful acts or omissions to act of employees of the defendant while acting within the scope of their office and employment, under circumstances wherein the United States of America, if a private person, would be liable to the claimant in accordance with the law of the place (Pennsylvania) where the acts or omissions occurred.

4. All of the allegedly tortious acts or omissions to act on the part of the defendant's employees caused harm to Duane A. Rowe and William Lee Smith, if at all, within the borders of this, the Western District of Pennsylvania.

5. The Cessna was owned by Kullberg Drilling Company, Inc., and its pilot and pilot in command [5] for the flight from Chicago to Pittsburgh was Richard Robert Kullberg.

6. Kullberg possessed a private pilot's license, but was not rated for instrument flying in IFR (Instrument Flight Rules) weather conditions.

7. The Cessna, with Kullberg as pilot and Smith and Rowe as passengers, took off from Midway Airport, Chicago, Illinois, at approximately 12:16 A.M., C. S.T., on January 8, 1961, headed for Pittsburgh, Pennsylvania.

8. Kullberg was cleared for take-off by F.A.A. Air Traffic Control at Midway and given course to fly to take him above the overcast. He reported VFR (Visual Flight Rules, i. e., he was flying by visual references) "on top" (of the overcast) at 6300 feet and was cleared to leave the Midway radio frequency.

9. Attributing a presumption of due care to Kullberg,[6] and considering the testimony of John Blasic, United States Weather Bureau pilot briefer at Midway during the evening of January 7, 1961, we find that Kullberg received from Blasic, prior to take-off, a weather forecast for Pittsburgh of overcast, light snow flurries, 15 miles visibility, tops of clouds at 5000-6000 feet, possibility of light to moderate icing, and en route ceiling of 2,000 feet minimum.

---

5. 14 C.F.R. § 43.70 provided:
"§ 43.70 Definitions.
"As used in this part terms shall be defined as follows:
" * * *
"Pilot. A pilot is a person holding a valid pilot certificate issued by the Administrator.
"Pilot in command. Pilot in command shall mean the pilot responsible for the operation and safety of the aircraft during the time defined as flight time."

6. 14 C.F.R. § 60.11 provided:
"§ 60.11 Preflight action.
"Before beginning a flight, the pilot in command of the aircraft shall familiarize himself with all available information appropriate to the intended operation. Preflight action for flights away from the vicinity of an airport, and for all IFR flights, *shall include a careful study of available current weather reports and forecasts, taking into consideration fuel requirements, an alternate course of action if the flight cannot be completed as planned,* and also any known traffic delays of which he has been advised by air traffic control." (Emphasis supplied.)

10. The flight was heard from en route at approximately 3:11 A.M., E.S.T., by the F.A.A. Flight Service Station at Akron, Ohio, to which it identified itself as "N5138E", reported its altitude as 11,000 feet "on top", and directed an inquiry as to the current weather at Pittsburgh. It was advised that current Pittsburgh weather was ceiling 2,000 feet overcast, visibility more than 15 miles, very light snow showers, temperature 34°, dewpoint 24°, wind W.N.W. 18. He was given a flash advisory forecast of moderate to locally severe turbulence in Western Pennsylvania below 10,000 feet with moderate to occasionally heavy icing. The flash advisory covered the time required for the flight to reach Pittsburgh. At this point the pilot also asked whether the Greater Pittsburgh Airport (GPA) radar approach facilities were in operation. Akron contacted Approach Control at GPA, was advised that said facility's radar was indeed functioning, and so advised N5138E.

11. Approximately 30 minutes later, at 3:44 A.M., E.S.T., N5138E contacted the F.A.A. Pittsburgh Flight Service Station, and reported its position as 12,-500 feet over the Pittsburgh "Omni" or V.O.R. (Very High Frequency Omni (Directional) Range Radio Transmitting Station, located 17 miles southeast of GPA). It requested and received the radio frequency of Approach Control at GPA.

12. Plaintiffs' Exhibit 10, a certified typewritten transcript of the tape recording of the complete radio conversation between Approach Control and N5138E, accurately states that conversation.

13. The times stated in such transcript represent Greenwich Mean Time. Eastern Standard Time is determined by subtracting five hours from Greenwich Mean Time.

14. The Cessna initially contacted Approach Control at 3:47:03 A.M., E.S.T., reporting its position at 12,500 feet over the "Omni". At this time, it was actually 9 miles northeast of the Omni, and proceeding in a northeasterly direction. It had been "tracked" by means of Approach Control's surveillance radar scope from the time of its original appearance thereon (aircraft within a 30-mile radius of the appropriate radar screen at GPA would be seen upon the scope).

15. At 3:47:15 A.M., Approach Control inquired as to the type of assistance desired by N5138E and was eventually informed (3:47:33) that the flight desired radar assistance in let down. One type of radar assistance is "vectoring" (providing compass headings) for an IFR approach to a landing.

16. Approach Control then inquired as to the amount of fuel aboard and was advised (3:47:42) that the Cessna had fuel available for 2½ hours of flying time. The inquiry was made for the purpose of ascertaining whether the Cessna required any priority treatment, and the response indicated to Approach Control that it did not.

17. The conversation between N5138E and Approach Control at 3:48:-44 to 3:48:49 indicates that the flight was then VFR at 12,600 feet, on top of the overcast.

18. At 3:49:27, N5138E was cleared to descend to 6,000 feet and requested to advise leaving altitudes. At 3:49:33 Cessna started its let down from 12,600 feet. At 3:51:28, approximately two minutes later, it reported its altitude as 11,000 feet, established on a heading of 360°.

19. A Capital Airliner had been transferred to the jurisdiction of Approach Control by the GPA traffic control center at an altitude of 5,000 feet shortly before N5138E's initial contact with Approach Control. The airliner was then in the overcast, and maintained its altitude while being observed and vectored by Approach Control. At 3:50:47, it reported ground contact at 3,500 feet MSL (2332 feet above GPA), and at 3:51:55 was turned over to the control tower frequency for its final approach.

20. When the Capital pilot left his position "on top" of the clouds at a position approximately 40 miles or less southwest of GPA and descended to an altitude of 5,000 feet in the clouds, the top altitude of the "solid" overcast was 8,500 feet and, in his opinion, remained at that altitude for the remainder of his flight to GPA.

21. We find that there was a solid overcast between 2,000 and 8,500 feet over GPA and the surrounding area.

22. At no time did the Capital flight report any icing, turbulence or other difficulty to Approach Control.

23. At 3:51:38, 10 seconds after the Cessna reported his altitude at 11,000 feet, the Cessna pilot specified the type of radar assistance he desired by acknowledging that he wished an IFR approach to GPA.

24. The request to advise leaving altitudes meant that the Cessna should have advised Approach Control as it cleared 11,000 feet, 10,000 feet, 9,000 feet, 8,000 feet and every additional 1,000 feet of altitude cleared on its descent.

25. The Cessna pilot never reported leaving his altitudes after 11,000 feet.

26. At 3:52:37, one minute after acknowledging he wanted an IFR approach, the pilot reported establishing a 290° heading.

27. The instrument landing runway at GPA was runway 28 which had a heading of 280°. The controller gave the Cessna headings to line it up with runway 28, the instrument landing runway, in accordance with the desired IFR approach.

28. At the time (3:54:41) of N5138E's last intelligible transmission, Approach Control attempted to instruct the aircraft to change its heading from 290° to 300°, to compensate for what, in the judgment of the controller tracking it, appeared to be a slight course deviation caused by wind drift.

29. At approximately 3:55:14, N5138E was observed on radar to be making a 180° turn to the left, contrary to the instruction given previously to turn 10° to the right (from 290° to 300°). Except for an unintelligible or aborted attempt at communication at 3:55:19, the Cessna was never heard from again. There was no reply to the repeated attempts of Approach Control to contact the flight. Subsequently, its wreckage, together with the bodies of Kullberg, Rowe, and Smith was found strewn about a hillside near Monroeville, Pennsylvania, approximately 22 miles east of GPA and 2 miles east of the position where it was last observed on radar.

30. The rate of descent of the Cessna from 12,600 feet to 11,000 feet in 2 minutes was 800 feet per minute.

31. At the same rate of descent, by 3:55:19 the Cessna would have descended into the solid overcast to an altitude of approximately 7,800 feet (700 feet into the overcast).

32. As of 3:55:19, when obviously in trouble, the Cessna was in the overcast for not more than a minute. This was an insufficient period for it to accumulate a disabling ice formation.

33. In any event, there is no evidence of icing conditions at or above 5,000 feet at that time and place.

34. Icing usually occurs only in clouds (T., pp. 203–204). Although the Capital pilot, in the investigational aftermath of the Cessna's crash, reported that his aircraft had accumulated ice in its quick descent from 5,000 to 3,000 feet, there is no evidence of any ice forming on the Cessna at any time. The Cessna was in difficulty before reaching 5,000 feet.

35. During its descent, the Cessna never complained of icing; the Cessna never complained of turbulence; the Cessna never declared an emergency or gave any indication of difficulty.

36. Such F.A.A. rules, regulations, recommendations, or information as applied to the Cessna and Approach Control on the night of January 7th and early morning of January 8, 1961, were set forth in Title 14, Code of Federal Regulations (revised as of January 1, 1961), in the Air Traffic Control Proce-

dures Manual (Government Ex. G), United States Standard Manual of Radar Air Traffic Control Procedures (Government Ex. H), and Flight Information Manual (Government Ex. I). There was no F.A.A. rule or regulation which required an approach controller to question a pilot's qualifications, advise a pilot of the possibility of encountering *forecast* icing conditions, or to inquire if he had deicing equipment.

37. Icing conditions cannot be seen on a radar scope; nor can turbulence or light snow showers. Only heavy precipitation can be seen on a radar scope.

38. The Cessna was required to obtain weather information at its point of departure and could also have obtained it along the route by contacting F.A.A. flight service stations, or by tuning in to the scheduled radio broadcasts of weather information made by such stations.

39. Flight Service Stations such as Akron Flight Service Station served the function of providing weather information to pilots in flight. The Cessna received all pertinent, available weather information, current and forecast, from the Akron Flight Service Station.

40. Such activities by Flight Service Stations served the additional purpose of freeing approach controllers to devote the maximum time possible to their primary duty, i. e., the employment of radar and navigational guidance to sequence aircraft flying in accordance with IFR rules in such a manner as to prevent mid-air collisions. Paragraph 120 of Government Exhibit G defines "approach control service" as a service provided for IFR flights. It is notable that the facility was located at GPA in a room called the Instrument Flight Room, where the personnel had no visual reference to aircraft under their jurisdiction.

41. In accordance with regular procedure, the approach controller had only the actual prevailing local weather information for GPA, as furnished hourly by the Weather Bureau over its Tel-Auto-graph. That consisted of the hourly sequence and included the ceiling, visibility, temperature, dew point, wind velocity and wind direction. It did not include weather *forecasts*. He possessed no knowledge relating to the height of the overcast, any prevailing icing condition, or turbulence. Nor did he have knowledge of the contents of the flash advisory forecast given the Cessna by the Akron Flight Service Station.

42. The hourly sequence for 0758Z (2:58 A.M., E.S.T.) which was given to the approach controller on the Tel-Autograph contained the same "current" Pittsburgh weather as was given to the Cessna by the Akron station. That sequence listed no pilot reports and, hence, no information concerning the top of the overcast or icing conditions actually encountered.

43. There was no F.A.A.-promulgated duty placed upon the controller to transmit weather information except at the time of granting an approach clearance, at which time the altimeter setting and the velocity and directions of the wind had to be given; and also when ceiling for visibility was at or below highest circling minimums.

44. No approach clearance had been given the Cessna, nor was the ceiling and visibility at or lower than the highest circling minimums.

45. A pilot flying VFR "on top" can see any cloud layers beneath him, as well as the horizon they form. If he is informed of the altitude level of the "ceiling", he is in a better position than the approach controller to determine the depth of the overcast.

46. When flying on top of an overcast, moonlight and stars provide visual references. On the night in question the moon rose at 11:43 P.M. on January 7, 1961 and set at 11:21 A.M. on January 8, 1961. At the time of the accident, the moon phase was one day preceding the last quarter, and was at a point approximately 40° above the horizon (Stipulation filed May 29, 1963).

47. There was no F.A.A.-promulgated duty placed upon the approach con-

troller to order the Cessna to another airport under the circumstances of this case.

48. The Flight Information Manual, Government Ex. I, advised non-instrument-rated pilots (p. 86) to choose an alternative course of action (if available), *rather than request* radar approach or let down in IFR conditions. Thus, the pilot should have initiated inquiries as to the availability of other airports. For example, 14 C.F.R. § 60.41 required that pilots filing IFR flight plans before take-off indicate thereon an alternate airport.[7] See also, 14 C.F.R. § 60.11, footnote 6 supra. If an alternative course was not available, the Cessna pilot should then have advised Approach-Control that he was not instrument rated and declared an emergency.

49. If the pilot had declared an emergency, the controller could have ascertained the nature of the emergency and then, as the situation warranted, have adopted one of two courses: (1) he could have given the Cessna priority treatment and the simplest clearances to attempt to effect a landing at GPA; or (2) after determining from information supplied by the pilot and other F.A.A. facilities that a suitable alternate airport was in fact available, directing the Cessna to it.

50. The Flight Information Manual (pp. 47–48) recommended that a pilot fly a triangular pattern if he encountered an emergency and had radio failure.

51. The Cessna did not fly any such triangular pattern.

52. The rules for the pertinent type of radar assistance are set out in sections 1.2(5) and 4, respectively, of Gov-

ernment Exhibit H. In addition, normal standards of maintaining separation to prevent in-flight collision as set forth in Government Exhibit G were used in rendering radar assistance.

53. The Standard Radar Manual (section 4.1) provides that the pilot is responsible for determining whether the approach or landing is authorized under existing weather minimums.

54. By its terms, section 100.7 of Government Exhibit G, requiring a controller to use his best judgment in giving clearances, was applicable only if no other rules existed. Other rules did exist, as above mentioned.

55. Approach Control's surveillance radar could not reflect the altitudes of the Cessna during its descent.

56. The words "I would like radar assistance in let down" meant to the controller that the Cessna pilot wanted certain compass headings so that he could "let down" or descend to an altitude appropriate for the commencing of an approach.

57. This is done, where no emergency is known to exist, solely by supplying the pilot with headings for directional guidance and traffic separation, while "tracking" his flight by means of the surveillance radar scope.

58. The approach controller inquired if the pilot wanted an IFR approach in order to clarify the type of radar assistance desired and the type of flying entailed thereby.

59. When an aircraft is above a solid overcast, the only way it can land at an airport underneath that overcast is by flying through it, in accordance with Instrument Flight Rules.

---

7. 14 C.F.R. § 60.41 provided:

"§ 60.41 IFR flight plan.

"Prior to operating in controlled airspace, a flight plan shall be filed with air traffic control. Such flight plan shall contain the following information unless otherwise authorized by air traffic control:

" * * *

"(k) Alternate airport or airports * * *."

14 C.F.R. § 60.60 provided:

"§ 60.60 Definitions.

"As used in this part, terms shall be defined as follows:

" * * *

"Alternate airport. An airport specified in the flight plan to which a flight may proceed when a landing at the point of first intended landing becomes inadvisable."

60. By affirmatively acknowledging that he wished an IFR approach, the pilot was requesting a clearance to make an instrument flight through the overcast in IFR weather conditions in order to land at GPA.

61. The pilot knew he was VFR on top and would have to fly through the overcast to make a landing.

62. When the Cessna reached a position 1,000 feet above the clouds on his descent, the nature of the flight was changed from one under VFR conditions to one under IFR conditions in accordance with the definition of IFR conditions contained in 14 C.F.R. § 60.30 [8] and 14 C.F.R. § 60.60,[9] and thereafter Kullberg, although not instrument rated, flew in IFR conditions.[10]

63. The Flight Information Manual, (p. 86), further advised pilots that although the controller could use radar to provide separation from other traffic and navigational guidance to an airport, "the job of flying the aircraft safely still rests with the pilot".

64. There is no evidence that the pilot rejected or questioned any clearance, or requested an amended clearance.

65. Only the pilot was in a position to determine proximity to the tops of clouds so as to determine at what altitude IFR conditions would commence upon his descent. The Flight Information Manual advised that "the pilot must keep the controller advised of the weather conditions in which the aircraft is operating and along its course ahead" (p. 86).

66. The pilot neither advised the controller of weather conditions nor did he advise him of his altitudes after leaving 11,000 feet.

67. The Flight Information Manual further advised that "authorization to proceed in accordance with such radar navigational assistance does not constitute authorization to the pilot to violate the Civil Air Regulations" (p. 86), thereby placing the pilot on notice that traffic control service to aircraft did not relieve him of responsibility for safe operation of the aircraft.[11]

68. The aircraft sustained damage and in-flight breakup prior to impact due to heavy positive loads on the aircraft. Loads or loading refers to aerodynamic forces of air encountered by the aircraft while in flight.

69. Most probably, the pilot became disoriented upon entering the overcast,

---

8. 14 C.F.R. § 60.30 provided:

"§ 60.30 Basic VFR minimum weather conditions.

"[A]ircraft shall not be flown VFR in weather conditions below those specified herein.

"(a) Clearance from clouds—(1) In controlled airspace. Aircraft shall not be flown VFR less than 500 feet vertically under, 1,000 feet vertically over, and 2,-000 feet horizontially from any cloud formation, except that in the continental control area, aircraft shall not be flown VFR less than 1,000 feet vertically and one mile horizontally from any cloud formation. * * *."

9. 14 C.F.R. § 60.60 provided:

"§ 60.60 Definitions.

"As used in this part, terms shall be defined as follows:

" *  *  *

"IFR conditions. Weather conditions below the minimum prescribed for flights under VFR.

" *  *  *."

10. 14 C.F.R. § 60.12 provided:

"§ 60.12 Careless or reckless operation.

"No person shall operate an aircraft in a careless or reckless manner so as to endanger the life or property of others.

"Note: Examples of aircraft operations which may endanger the lives or property of others are:

" *  *  *

"(e) An operation conducted above a cloud layer in accordance with VFR minimums which results in the pilot becoming involved in instrument flight, unless the pilot possesses a valid instrument rating, the aircraft is properly equipped for instrument flight, and all IFR requirements are observed."

11. 14 C.F.R. § 60.2 provided:

"§ 60.2. Authority of the pilot.

"The pilot in command of the aircraft shall be directly responsible for its operation and shall have final authority as to operation of the aircraft. * * *"

losing his visual references and control of the aircraft.

70. It is most probable that the aircraft broke up in flight due to heavy positive loading encountered during a high-speed spiral occasioned by the pilot's loss of control.

71. The Cessna was not equipped for flight in icing conditions.

72. There is no evidence of a breach of any duty owed by the approach controller to the occupants of the Cessna.

73. There is no evidence that the personnel manning Air Traffic Control at Midway Airport, Chicago, owed any duty to the occupants of the Cessna respecting the transmission to F.A.A. facilities at Pittsburgh of information concerning the Cessna's flight, or even if they did, that they breached any such duty.

74. In any event, there was no causal connection between any alleged act or omission to act on the part of defendant's employees and the deaths of Rowe and Smith, whether the Cessna's in-flight break-up was due to the pilot's disorientation (as we find) or to a disabling accumulation of ice; the pilot of N5138E possessed all available information pertaining to flying conditions and better than any other person knew whether he and his aircraft were equipped to fly in them.

### DISCUSSION

Because all three occupants of the Cessna were killed in the crash, fact finding concerning the altitude of the top of the overcast and the cause of the in-flight breakup depended upon the contents of an airline pilot's letter and upon opinion evidence.

TOP OF OVERCAST. The parties stipulated to the admission into evidence of plaintiffs' Exhibit 9, a copy of a letter written by one Frank M. Fox in the week following the crash. Fox piloted the Capital Viscount airliner which landed at GPA at approximately the same time that the Cessna was receiving navigational guidance from Approach Control. The letter states: "The top of the solid overcast was 8500 [feet] * * *."

The testimony of approach controller Melford Anderson indicates (T., pp. 271-273) that Fox was transferred to the jurisdiction of Approach Control while just east (plaintiffs' Ex. 9) of the "Wheeling Omni Station" and approximately 23 miles southwest of GPA, and that he was then flying at an altitude of 5,000 feet. How he could judge the top of the overcast as being at 8,500 feet while maintaining flight at 5,000 feet is unclear, but it appears a fair inference that, shortly before coming under Approach Control's jurisdiction, he had descended from a higher altitude at which the top of the overcast could be determined without difficulty. While at such higher altitude, he would have been able to scan the horizon for miles ahead and conclude that the top of the "solid" overcast en route to GPA was generally at 8,500 feet. In this connection, Government Exhibit J reveals that the otherwise unidentified pilot of a "Viscount" aircraft reported that as of 3:40 A.M., E.S.T., while flying approximately 40 miles southwest of Pittsburgh, he observed the top of the overcast to be at 8,000-8,500 feet. Approximately two or three minutes later (T., p. 271), pilot Fox's "Viscount" came under the jurisdiction of Approach Control.

We think that this evidence, while lean, is sufficient to support a finding that the solid overcast surrounding GPA had a "top" altitude of 8,500 feet. The alternative would be to find an insufficiency of evidence concerning the altitude of the top of the overcast and, accordingly, that plaintiffs have not even proved that the Cessna ever *entered* the overcast, let alone that it encountered limited visibility or icing conditions therein.

CAUSE OF IN-FLIGHT BREAKUP. In the final analysis, plaintiffs cannot recover whether the in-flight breakup resulted from pilot disorientation or an encounter with icing conditions inasmuch as we find that neither was the product of a breach of any duty owed by the defendant's employees.

However, we find that the most probable cause of the breakup was the application to the Cessna of heavy positive "loads" (aerodynamic forces) produced during a spiral at high speeds, and that the spiral occurred because the non-instrument-rated pilot became disoriented upon entry into the solid overcast and lost control of the aircraft. Uncontradicted opinion testimony to this effect was given by the Government's three expert witnesses: Edward Day, special assistant to the Chief of the Operations Evaluation Division, Federal Aviation Agency (T., p. 250); Obed T. Wells, Designated Manufacturer's Certification Representative and executive engineer of the Cessna Aircraft Company, the manufacturer of N5138E (T., pp. 472, 483, 484, 507); and Dr. Willis E. Anderson, flight surgeon and staff assistant to the Civil Air Surgeon, Federal Aviation Agency (T., pp. 522–532, 547–548). The only evidence reflecting the possible existence of icing conditions is (1) the flash advisory forecast given the Cessna by the Akron Flight Service Station, *predicting* moderate to occasionally heavy icing conditions over western Pennsylvania; and (2) the statement of Capital Airlines' pilot Fox, in his letter, that his Viscount had accumulated ice in his quick descent to 3,000 feet (from the flight level of 5,-000 feet theretofore maintained by him). Such evidence is, in our opinion, of insufficient probative value. Fox's letter does not make mention of icing conditions at 5,000 feet or higher altitudes, and the evidence is clear that the Cessna encountered its difficulty at an altitude of approximately 7,800 feet or higher.

Dr. Willis E. Anderson also gave an opinion (T., pp. 522–530, 547–548) that

the pilot's disorientation was compounded by a mild hypoxia and fatigue. However, we deem the premises supporting this opinion to be too speculative and rest upon our finding of pilot disorientation.

■ SUPERSEDING CAUSE. Even if it were found that any employee of the defendant was negligent, we think the patent recklessness of the non-instrument rated pilot superseded that negligence and would relieve the United States from liability for the deaths of Rowe and Smith. Restatement, Torts, §§ 440, 447. The intervening act of the unqualified pilot in deliberately descending into a solid overcast was not only reckless conduct, but may be regarded as so highly extraordinary as to become a superseding cause of the deaths of his passengers, Rowe and Smith. We do not think that any employees of defendant could reasonably have foreseen such conduct on the part of the pilot. Id. § 447, comment g; and see § 500. Cf. Central Flying Service v. Crigger, 215 Ark. 400, 221 S.W.2d 45, 48.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over the parties and the subject matter of this action. 28 U.S.C. § 1346(b).

2. Venue is laid in this District, in accordance with 28 U.S.C. § 1402(b).

■ 3. Plaintiffs' allegation that defendant failed to promulgate any procedure instructing air controllers on furnishing radar assistance to visual flight pilots is barred by the "discretionary function" defense available to and interposed by the defendant. 49 U.S.C. § 1421 (a) (6);[12] 28 U.S.C. § 2680(a);[13]

12. 49 U.S.C. § 1421 provides:
   "§ 1421. Powers and duties of Administrator—Minimum standards; rules and regulations
   "(a) The Administrator is empowered and it shall be his duty to promote safety of flight of civil aircraft in air commerce by prescribing and revising from time to time:
   "* * * *
   "(6) Such reasonable rules and regulations, or minimum standards, governing

other practices, methods, and procedure, as the Administrator may find necessary to provide adequately for * * * safety in air commerce."

13. 28 U.S.C. § 2680 provides:
   "§ 2680. Exceptions
   "The provisions of this chapter and section 1346(b) of this title shall not apply to—
   "(a) Any claim * * * based upon the exercise or performance or the failure to exercise or perform a discretionary

Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953); National Mfg. Co. v. United States, 210 F.2d 263 (8th Cir. 1954), cert. denied 347 U.S. 967, 74 S.Ct. 778, 98 L.Ed. 1108; Bartie v. United States, 216 F.Supp. 10 (W.D.La.1963); Blaber v. United States, 212 F.Supp. 95 (E.D.N.Y.1962); Braniff Airways, Inc. v. United States, 203 F. Supp. 602 (S.D.Fla.1961).

 4. Air Traffic Control at Midway Airport owed no duty to Rowe and Smith, in the circumstances of this case, to relay information concerning the flight of N5138E to F.A.A. facilities at Pittsburgh.

 5. An approach controller has no duty to determine either the qualifications of a pilot to follow clearances for a type of flight requested by the pilot, or whether the aircraft piloted has suitable equipment for such type of flight. Martens v. United States, 5 Avi. 17,465 (S. D.Cal.1957).

 6. There is no duty for an approach controller to volunteer weather information to an aircraft under his jurisdiction, except in accordance with paragraphs 265.1 and 265.2 of Government Exhibit G, or if he has previously given such aircraft dangerously inaccurate or misleading information, or perhaps unless he has actual knowledge of a hazardous current weather condition which the aircraft may encounter in flight and of which it may not yet be aware. Air Traffic Control Procedures Manual, ATM-2-A, Federal Aviation Agency, Nov. 1, 1960; cf. Bright v. United States, 149 F.Supp. 620 (E.D.Ill. 1956); Smerdon v. United States, 135 F.Supp. 929 (D.Mass.1955).

 7. The approach controller owed no duty to Rowe and Smith in the circumstances of this case to initiate an inquiry to N5138E concerning the advisability of a landing at an alternate airport, or to order the pilot to do so, in the absence of any declaration of emergency or other indication of difficulty made to him by the pilot.

8. The defendant, acting through its employees at Midway and Greater Pittsburgh Airports, breached no duty of care owed to the plaintiffs' decedents.

9. The plaintiffs are not entitled to the relief sought and defendant is entitled to judgment dismissing their action on the merits.

function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."