Hilde E. MICHELMORE, etc., Plaintiff,

v.

UNITED STATES of America, etc.,
Defendant.

Joan M. SPAULDING, etc., et al.,
Plaintiffs,

v.

UNITED STATES of America,
Defendant.

UNITED PACIFIC INSURANCE COM-
PANY, Plaintiff,

v.

Hilde E. MICHELMORE, etc., et al.,
Defendants.

Nos. 67–448–HW, 67–301–HW,
65–1587–HW.

United States District Court
C. D. California.

May 12, 1969.

James G. Butler, Ned Good, Los Angeles, Cal., for Hilde E. Michelmore and Joan M. Spaulding and others.

Wm. Matthew Byrne, Jr., U. S. Atty., Frederick M. Brosio, Jr., Asst. U. S. Atty., James Stotter II, Asst. U. S. Atty., Los Angeles, Cal., and Lawrence J. Galardi, Asst. Chief, Torts Section, U. S. Dept. of Justice, John R. Harrison, Federal Aviation Administration, Department of Transportation, of counsel, for the United States.

Marshall L. Foreman, Jr., Luce, Forward, Hamilton & Scripps, San Diego, Cal., for United Pacific Ins. Co.

## OPINION MEMORANDUM

WESTOVER, District Judge.

Dorman D. Michelmore, a resident of Reseda, California, owned a twin-engine Beechcraft airplane (hereinafter referred to as the "Baron") and was a licensed pilot, holding private license certificate #1772471, rated for multi-engine and single-engine land airplanes; on the certificate were no medical limitations.

Accompanied by his son, John B. Michelmore, and by Jack Edward Spaulding, Mr. Michelmore departed Los Angeles in the Baron on March 26, 1965, en route to the Sebring Auto Races in Sebring, Florida. Upon arrival at Hous-

ton, Texas, it was decided, because of adverse weather conditions, to ground the Baron there and to continue the trip to Sebring by commercial flight. At the conclusion of the Sebring races the three individuals returned to Houston; and on March 29, 1965 Dorman D. Michelmore, pilot of the Baron, filed by telephone with the Houston Flight Service Station a Visual Flight Rules flight plan, destination El Paso, Texas, and at the same time he asked for weather information along the route of his proposed flight.

The Houston Flight Service Station gave to Mr. Michelmore the weather information then available to it. Some four minutes after his departure from Houston at 10:46 Central Time, Mr. Michelmore established radio communication with the Houston Flight Service Station and, at this contact, further weather information, known as Sigmet Alpha 1, was given to him.

Mr. Michelmore possessed a private pilot's license which authorized him to fly single- and twin-engine aircraft under visual flight rules (VFR). The limitation of VFR means that a pilot may fly only when visibility is not less than three miles forward, and the plane is to be operated at no time closer than 500 feet below, 1000 feet above, or 2000 feet horizontally from any cloud formation (14 C.F.R. 91.105). To operate aircraft when visibility is less than three miles or when flight through clouds is to be conducted, the pilot must be instrument rated (IFR qualified) which means he must be able to navigate his aircraft through air space solely by reference to instruments within the cock-pit and without outside visual reference. Dorman D. Michelmore was a VFR pilot. He was not qualified as an IFR pilot.

At the time of take-off at Houston the weather there was overcast; and the pilot was informed by government employees that northwest of Austin a cold front was approaching Austin and would probably cross his line of flight and that he could expect thunderstorms and cloudy weather after leaving Houston. In the face of such adverse weather in-

formation Mr. Michelmore decided to proceed with the flight to El Paso, Texas.

Leaving Houston, Mr. Michelmore flew in VFR weather, which condition continued for some distance west of Houston. He discovered, however, that not only was there an overcast between Houston and Austin but also, on top of the overcast, was a second overcast; that after penetrating and passing through the lower overcast he found cloud formations above, below, and on either side. After departing Houston, Mr. Michelmore had to detour around thunderclouds.

Approaching Austin, he was conscious of the fact that the clouds were closing in, but apparently he decided either that the clouds would be scattered and he would be able to see the ground or that the cloud formation was not deep. Dorman D. Michelmore first contacted the Austin Flight Service Station at 11:20 A.M., at which time he reported he was in VFR condition. Approximately four minutes later—he called and said he was in the clouds.

The Baron's cruising speed was approximately 230 miles per hour or about 4 miles per minute. At 11:33:25 the Baron contacted Austin Approach Control, stating that he had lost VFR and asking if Austin Approach Control had him on the scope. Austin Approach Control requested the Baron's heading, and at that time the pilot reported:

"Ah three one five zero degrees, * * *, I can maintain on auto pilot but I would prefer to get down if I can."

Austin Approach Control inquired

"* * * are you instrument rated?"

Mr. Michelmore responded:

"Negative."

And to the Austin Approach Control's inquiry whether the Baron was in VFR conditions at that time, the pilot again responded in the negative.

Pursuant to Mr. Michelmore's statement that he would prefer to get down, the Austin Approach Control informed him as follows:

"I'll be unable to approve approach for your aircraft unless you declare an emergency since you're not an instrument rated pilot, * * *."

And Mr. Michelmore replied:

"* * *, I guess I'll have to declare emergency. * * *."

He was then asked by Austin Approach Control if he was ILS equipped and whether he was familiar with ILS, and he replied in the affirmative.

Inasmuch as the Baron could not be located on the Austin Approach Center scope, Mr. Michelmore was directed to

"* * * turn right heading zero two zero degrees for radar identification, * * *."

The directed turn was made, and Mr. Michelmore was informed by Austin Approach Control:

"* * *, radar contact turn right heading one two zero."

He was requested to give his altitude, to which Mr. Michelmore responded that he was thirty-seven hundred.

The Austin Approach Control instructed him to

"* * *, descend and maintain two thousand two hundred."

And Mr. Michelmore replied,

"I'm descending very rapidly."

Thereafter, Austin Approach Control lost the Baron on radar and could not contact the pilot. Subsequently it was ascertained that the plane had crashed at approximately 11:39 A.M. and all three occupants had been killed.

The personal representatives of Dorman D. Michelmore and Jack Edward Spaulding filed suit under the Tort Claims Act—Title 28 United States Code, § 1346(b)—alleging negligence on the part of Federal employees. Plaintiffs contend that Federal employees at the Houston Flight Service Station were negligent in giving weather information to the pilot, Dorman D. Michelmore.

The evidence discloses, however, that the Houston Flight Service Station gave

to Dorman D. Michelmore all weather information available at the time he filed his flight plan and again when he was air-borne. The pilot knew of the overcast condition at Houston. He had information of thunder clouds along his proposed flight route. He had information of the cold front approaching Austin from the northwest and although, at the time he left Houston, Houston was VFR, the pilot could, nevertheless, have contemplated that the weather report indicated the weather condition west of Houston would deteriorate.

Plaintiffs seem to believe that not only was it the responsibility of the Houston Flight Service Station employees to give requested weather information but, in addition, they should also have advised Dorman D. Michelmore against his contemplated flight.

A pilot commands his aircraft; his is the final decision as to its operation. (14 C.F.R. 91.3). No authority has been cited to the court to indicate that a Flight Service Station, in disseminating weather information, has an additional duty to advise a pilot that he should not "take off." If the weather is sufficiently adverse, the station may, however, refuse clearance. But, having information as to contemplated weather conditions when he has been given clearance, the pilot has the responsibility to determine whether it is safe or unsafe to undertake a proposed flight, for he and he alone knows the capability of his aircraft, and he and he alone knows his own qualification to operate the aircraft.

Plaintiffs also contend that the Federal employees at Austin Approach Control, in giving directions to turn the Baron and descend for landing, were negligent; they assert that the turns as directed, in conjunction with the directions to descend, caused the pilot to lose control of the aircraft and were, consequently, the direct and proximate cause of the accident.

It cannot be disputed that Dorman D. Michelmore was negligent in flying into an IFR condition when he was not an IFR certificated pilot. But plaintiffs contend that even though he may have been negligent in flying into IFR conditions he, nevertheless, after finding himself in such weather, was excused for his negligent conduct as Austin Approach Control had the last clear chance to extricate him from his hazardous position.

During the trial of this case there was much speculation as to what occurred in the cock-pit of the Baron after Mr. Michelmore had piloted his plane into the cloud formation.

Evidence was introduced to attempt to establish that Dorman D. Michelmore's application for pilot's license failed to contain correct answers to some of the questions as to his general health and, consequently, that he received a license to which he was not entitled. Defendant also attempted to establish there had been a failure of the automatic pilot under which Mr. Michelmore notified Austin Approach Control he was flying and that this automatic pilot failure had been the proximate cause of the crash.

Plaintiff on the other hand tried to substantiate that after the Baron flew into the clouds Mr. Michelmore became subject to spatial disorientation, commonly known as vertigo. Just when spatial disorientation commenced, if there was spatial disorientation, is a matter of conjecture.

One witness testified that the moment a pilot found his plane in the clouds and had lost ground contact he experienced spatial disorientation. From the record, however, it can be adduced that Dorman D. Michelmore took his aircraft into the clouds under automatic pilot and that the automatic pilot could have maintained the plane in level flight and headed in the right direction.

Another witness testified that when a pilot becomes spatially disoriented he has a tendency to disbelieve his own instruments, as a result of which there is such a thing as overriding the automatic pilot. Again, there is no evidence upon which could be based a find-

ing that the automatic pilot had failed to function or that the operator had overridden the automatic pilot. These are but theories and conjectures of the respective parties in an endeavor to arrive at some explanation of the crash.

Another contention advanced by plaintiffs is that the pilot could have been given directions to a VFR airport or instructed to ascend "above the clouds."

It seems to the court that this case can be decided without resorting to conjecture concerning spatial disorientation, or mal-function of the automatic pilot; or operator overriding of the automatic pilot, or directing the pilot to another airport or to ascend above the clouds.

■ To recover in their actions plaintiffs must substantiate some negligence on the part of a government employee, which negligence proximately caused the crash. It would seem that plaintiffs attempt to hold flight service employees to a responsibility greater than that in ordinary negligence cases. Fortunately, a complete record of the conversations between Dorman D. Michelmore and the ground was kept and was made available to the court. In reviewing the several requests and the directions plaintiffs now say, in retrospect, that the government employees did not give correct instructions to the pilot.

Plaintiffs allege that the directed turns should have been shallower, and plaintiffs emphasize that spatial disorientation was brought about by following directions for a deep turn and descent at the same time.

Dorman D. Michelmore confronted the Austin Approach Control with an emergency. Approach Control had in the air over Austin (among other aircraft in the air) a VFR pilot who was flying in IFR conditions. Not only was the Baron in danger, but there was also peril that other aircraft in that vicinity could come in contact with the Baron which was flying blind. Something had to be done immediately.

The first essential step was to locate the Baron on the Austin Approach Control radarscope. As heretofore pointed out, when asked for a heading the Baron's pilot gave

"Ah three one five zero degrees, * * *."

Evidently this heading was incorrect, for the plane could not be located on the scope on the heading given by Dorman D. Michelmore; consequently, the direction was given to him to make a right turn for radar identification. Before the direction to turn was given, the Austin Approach Control had ascertained from Mr. Michelmore that he was on automatic pilot and that the aircraft was ILS equipped, with which equipment Mr. Michelmore was familiar.

The direction to turn right, heading zero two zero for radar identification was a standard turn. Plaintiffs contend, however, that the person giving such direction was negligent, as the turn should have been made in stages or steps rather than at one time.

The turn could have been made safely as directed on automatic pilot, provided the automatic pilot was functioning and there was no overriding of the automatic pilot. There was no indication given to the director on the ground that Mr. Michelmore could not make a turn heading zero two zero in safety. In fact, the turn was made safely, for in a few seconds the Baron had turned and was located on the scope.

If the plane was to land, the next step required was to line it up for the runway. As a consequence, a direction was given to the Baron to "turn right, heading one two zero." Again, plaintiffs contend that such a turn direction should not have been given; that if it was necessary to turn the plane to that extent, it could have been turned in a short turn rather than in the long turn directed. If the automatic pilot was functioning and if the plane operator was, indeed, familiar with his ILS equipment as he had indicated, this turn, too, could have been negotiated in complete safety by Dorman D. Michelmore.

At the expiration of sufficient time to have made the turn, Mr. Michelmore was instructed to descend and maintain at 2200 feet. Had the turn been completed as directed, the descent to 2200 could have been made in safety.

Plaintiffs are incorrect in their assertion that the pilot was given direction to turn and descend at the same time, as the record clearly shows the order to descend was given after sufficient time had elapsed for Mr. Michelmore to have completed the turn as directed.

Was there negligence of the Austin Approach Control employee in giving instructions relative to turns and descent?

Was there anything to indicate that the turns and descent could not have been made in safety?

Discussing plaintiff's burden in a negligence action similar to the causes now before this court, a United States District Court in Massachusetts, in Smerdon v. United States, 135 F.Supp. 929 said, at page 931:

"In order to sustain his burden of proving by a preponderance of evidence that the government was negligent, the plaintiff must establish that the government's employees were negligent in the performance of their operational duties, and that such negligence was the proximate cause of the injury complained of. * * *."

The Supreme Court of the United States in 1872, in The Nitro-Glycerine Case, 82 U.S. 524, 21 L.Ed. 206 defined negligence (pages 536–537) as follows:

"* * *. 'Negligence' has been defined to be 'the omission to do something which a reasonable man, guided by those considerations which ordinarily regulate the conduct of human affairs, would do, or doing something which a prudent and reasonable man would not do.' [Citing Blyth v. Birmingham Water Works, 11 Exchequer, 784]. It must be determined in all cases by reference to the situation and knowledge of the parties and all the attendant circumstances. What

would be extreme care under one condition of knowledge, and one state of circumstances, would be gross negligence with different knowledge and in changed circumstances. The law is reasonable in its judgments in this respect. It does not charge culpable negligence upon any one who takes the usual precautions against accident, which careful and prudent men are accustomed to take under similar circumstances."

In a Texas case the United States Court of Appeals for the Fifth Circuit stated:

"Liability growing out of the operation of aircraft is to be determined by the ordinary rules of negligence and due care. * * *."

United States v. Schultetus, 277 F.2d 322, at 325, 86 A.L.R.2d 375.

In the causes now before this court, to determine whether the flight controller was negligent it is necessary to examine the facts in the light of the knowledge available to the flight controller and the situation then existing. He knew that he had a VFR pilot in the air operating under IFR conditions. He also had the pilot's declaration of emergency with which to cope and a request by that pilot "to get down if I can."

Inasmuch as these actions are brought under the Federal Tort Claims Act the law of Texas is to be applied. (28 U.S.C. § 1346(b)). It is advisable, however, to examine (with reference to the doctrine of emergency) cases arising in other states.

In a Missouri case, Hobbs v. Renick, 304 F.2d 856, the Court discusses the emergency doctrine and states, at page 861, the following:

"* * *. This is the principle, recognized by the Missouri courts, that, where an emergency exists requiring sudden action without time to deliberate, one is not to be held to the same strict accountability, as to his actions from a negligence standpoint, which is required when one is not

dominated by terror of impending danger. [Citations]. * * *."

The United States Court of Appeals for the Seventh Circuit in a Wisconsin case—Huse v. Consolidated Freightways, 227 F.2d 425—says, at page 430:

" * * *. The law in Wisconsin on this point [emergency] is that when a person suddenly finds himself in a place of danger, and is required to act without time to consider the best means that might be adopted to avoid impending danger, he is not guilty of negligence if he fails to adopt what subsequently and upon reflection may appear to have been a better method, unless the emergency in which he finds himself is brought about by his own negligence."

The law of Texas, as announced by its Supreme Court in Texas & P. Ry. Co. v. Bingham, 90 Texas 223, 38 S.W. 162 at 163 is as follows:

" * * * a party should not be held responsible for the consequences of an act which ought not reasonably to have been foreseen. In other words, it ought not to be deemed negligent to do or fail "to do an act when it was not anticipated, and should not have been anticipated, that it would result in injury to anyone. To require this is to demand of human nature a degree of care incompatible with the prosecutions of the ordinary avocations of life. It would seem that there is neither a legal nor a moral obligation to guard against that which cannot be foreseen, and under such circumstances the duty of foresight should not be arbitrarily imputed. * * *."

In Carey v. Pure Distributing Corp., 133 Tex. 31, 124 S.W.2d 847, the Court said:

" * * * it is not required that the particular accident complained of should have been foreseen. All that is required is 'that the injury be of such a general character as might reasonably have been anticipated; and that the injured party should be so situated with relation to the wrongful act that injury to him or to one similarly situated might reasonably have been foreseen.' San Antonio & A. P. Ry. Co. v. Behne, Tex.Com.App., 231 S.W. 354, 356."

The Court stated, in International Derrick & Equipment Co. v. Croix, 241 F.2d 216 (a Texas case) at 221:

" * * *. The well-settled negligence rule in Texas is that 'The ability to have foreseen and prevented the harm is determinative of responsibility.' 30B Tex.Jur. 179, Negligence, § 8. But,

" ' * * * it is not required that the particular accident complained of should have been foreseen. All that is required is "that the injury be of such a general character as might reasonably have been anticipated; and that the injured party should be so situated with relation to the wrongful act that injury to him or to one similarly situated might reasonably have been foreseen." * * *.' [Citations]."

The United States Court of Appeals for the Seventh Circuit in an Illinois case—Franklin v. United States, 342 F.2d 581—said, at page 584:

"The findings of the District Court must be considered in the light of the general principles of negligence applicable to air traffic control. In the absence of a special statute, the ordinary rules of tort law apply to aircraft accidents. United States v. Miller, 9 Cir., 303 F.2d 703. We must be guided by the standards of negligence under the laws of Illinois. * * *. Furthermore, liability will attach only if the resulting injury could reasonably have been anticipated or reasonably foreseen by the defendant. * * *."

The Fifth Circuit in Copeland v. Greyhound Corporation, 337 F.2d 822 at 825 (a Georgia case) quoted as follows:

" 'Where one is confronted with a sudden peril requiring instinctive action, he is not, in determining his course of action, held to the exercise

of the same degree of care as when he has time for reflection.' * * *.''

In United States v. Shultetus, 277 F. 2d 322, the District Court further found that the C.A.A. employees were negligent in what they did and what they failed to do and that their negligence was the cause of the collision with resulting loss of life and property. On appeal, the government attacked the District Court's findings, and the United States Court of Appeals for the Fifth Circuit stated, at page 326:

"It seems apparent that the district court had an erroneous concept of the functions and duties of the operators of the control tower. This is manifested in its findings, so called, that the operator at the control tower was negligent in failing to instruct the Cessna 170 to alter its course so as to avoid the possibility of collision with aircraft in the traffic pattern of Runway 13. * * *. The control tower is charged with the responsibility 'for the issuance of clearances and information to pilots of aircraft for the purpose of preventing collision between * * * Aircraft in the traffic pattern, and landing and taking off at the landing area.' * * *.

" * * *. The theory followed by the district court would place upon the operators of control towers the primary responsibility for the operation of aircraft at the field. Governmental regulations, having the force of law, have assigned this responsibility to the operators of aircraft.

" * * *.

" * * * the district court has overlooked the principle that the direct and primary responsibility for the operation of aircraft over or in the vicinity of an airport rests upon the pilots of the aircraft. * * *.''

In *Smerdon*, supra, the District Court in Massachusetts stated (page 932):

"From inspection of Part 617, Title 14, C.F.R. it is concluded that these regulations are designed for use by the Air Traffic Control operator in order for him to maintain aircraft within his control area safe from collision with one another, and from danger arising from obstacles on the surface of the movement area, such as other moving aircraft, construction vehicles, and facilities, or depressions in the surface of the runway, and the like. * * *. These regulations do not place upon Air Traffic Control operators the responsibility of determining whether or not a given weather condition is safe for a landing. The operator's duty in this case was limited to maintaining control of the airways "to prevent collision between aircraft under his control."

The cause most nearly in point with that now before this court is Kullberg v. United States, 271 F.Supp. 788. In that case the government contended the aircraft descended out of control in a high-speed spiral and that the pilot lost control when he became disoriented upon entering a solid overcast and losing his visual references therein.

Plaintiff, on the other hand, asserted that the government was at fault, inasmuch as the government agency had failed to warn the pilot of dangerous weather conditions; was negligent in failing to direct the pilot to a safer airport, and in directing the pilot to descend and hold an altitude in the clouds where turbulence and icing conditions were the worst.

Kullberg possessed a private pilot's license and was not rated for instrument flying. Kullberg reported his position at 12,500 feet over the Pittsburgh "Omni." At this time he was actually nine miles northeast of the Omni, proceeding in a northeasterly direction. Approach control inquired as to the type of assistance desired by the pilot and was informed that he desired radar assistance in let down.

The Court found there was no F.A.A. rule or regulation requiring an approach controller to question a pilot's qualifica-

tions, advise a pilot of the possibility of encountering forecast icing conditions, or to inquire whether he had de-icing equipment; that the pilot was required to obtain weather information at his point of departure and could have obtained it along the route by contacting F.A.A. Flight Service Stations or by tuning in on the scheduled weather broadcast made by such stations. The Court found further that if the pilot had declared an emergency, the controller could have ascertained the nature of the emergency and then, as the situation warranted, could have adopted one of two courses: (1) He could have given the pilot priority treatment and the simplest clearances to attempt to effect a landing at GPA; or (2) after determining from information supplied by the pilot and other F.A.A. facilities that a suitable alternate airport was in fact available, he could have directed the pilot to it.

The Court also found that Kullberg knew he was in VFR on top and would have to fly through the overcast to make a landing; that when the plane reached a position 1000 feet above the clouds on descent, the nature of the flight was changed from one under VFR conditions to one under IFR conditions; that most probably the pilot became disoriented upon entering the overcast and lost his visual references and control of the plane. And the Court concluded that the most probable cause of the accident was that spiraling occurred because the non-instrument-rated pilot became disoriented and lost control of the aircraft.

■ In the matter now before this court, the approach control operator was advised that an emergency existed; he knew that a VFR pilot was flying blind in clouds, presenting a potential danger not only to himself, his passengers, and his aircraft, but also to other aircraft in that immediate vicinity. Also, the approach control operator had the pilot's request to be let down. It was not the controller's duty to suggest to the pilot that he ascend above the clouds, or that he continue on his flight through the clouds, or that he make an about-turn and go back to his initial point of departure.

The approach controller was informed by Dorman D. Michelmore that he considered himself to be in emergency and requested to be let down. To render the requested assistance, the approach control operator had first to locate the Baron on the radar screen and, after locating the plane, had to line up the aircraft for landing. Extended conversation was had between the approach control operator and the pilot, in which Mr. Michelmore informed the controller that he was a VFR pilot and that he had on board ILS equipment and was familiar with ILS. The controller also knew that the Baron was on automatic pilot. There was nothing in the circumstances of the situation to indicate to him that the turns directed could not have been made in perfect safety.

■ Plaintiffs have asserted that other directions could have been given to Mr. Michelmore which would have been more feasible or safer than those given by the control operator. But in the emergency confronting him, the approach controller gave instructions which he believed, under the circumstances before him, reasonable and capable of accomplishment by the pilot. The fact that the crash occurred cannot be deemed the responsibility of the approach control operator. The crash was proximately caused by Dorman D. Michelmore's inability to control his aircraft.

■ One faced with an emergency is not required at his peril to correctly choose between alternatives; the courts in Texas probably go farther in absolving one charged with negligence than do courts of many of the states. The Supreme Court of Texas has said that the conduct of one who, after discovering and realizing the peril of another in imminent danger of being injured, fails to use ordinary care to avoid injuring such other person, is very nearly the equivalent, though not the exact equivalent, of deliberate and intentional misconduct.

Using that definition, it cannot be said in the instant case that the controller's conduct amounted to such lack of ordinary care as the Supreme Court of Texas described in Whited v. Powell, 155 Tex. 210, 285 S.W.2d 364.

 Under F.A.A. rules and the decisions of the courts the aircraft pilot, not the tower controller, is primarily responsible for the safe operation of the aircraft. Tilley v. U. S., 375 F.2d 678 at 682.

"In any action for negligence, whether against the government for the misfeasance or nonfeasance of its air traffic controllers or Flight Service Station attendants, or otherwise, the plaintiff must not only show that the injury was proximately caused by the defendant's negligent conduct, but that defendant owed a duty to plaintiff in the first place. [Citation]."

Somlo v. United States, 274 F.Supp. 827 at 836.

The three above-numbered cases were consolidated for pretrial; thereafter the three causes were called together as consolidated. However, we are not now determining the rights and liabilities of the respective parties in Case No. 65–1587–HW (United Pacific Insurance Company v. Michelmore, etc., et al.) except in finding that the United States Government was not negligent as alleged, either in giving or failing to give weather information to Dorman D. Michelmore or in attempting to assist him to "get down", for the proximate cause of the crash must be attributed to the pilot, Dorman D. Michelmore.

Based upon the finding that the acts and conduct of government employees were not the proximate cause of the crash, judgment will be in favor of the defendant in Nos. 67–301–HW and 67–448–HW. The issues presented in No. 65–1587–HW will be resolved at a future date.

Findings of Fact, Conclusions of Law, and Judgment will be prepared by counsel for defendant for presentation to the court on or before June 12, 1969.