**In re AIR CRASH DISASTER AT NEW ORLEANS (MOISANT FIELD), LOUISIANA, ON MARCH 20, 1969.**

**M.D.L. No. 64.**

United States District Court,
W. D. Tennessee, W. D.

June 27, 1975.

James D. Causey, Memphis, Tenn., Lee S. Kreindler, Alan J. Konigsberg, Stanley J. Levy, New York City, John Knox Aycock, Robert L. Dobbs, Cecil Keltner, George T. Lewis, Memphis, Tenn., for plaintiffs.

Thomas F. Turley, Jr., U.S. Atty., W.D. Tenn., W. Hickman Ewing, Jr., Asst. U.S. Atty., W.D.Tenn., Memphis, Tenn., Elliot S. Marks, Office of the Gen. Counsel, F.A.A., Washington, D.C., for defendant.

## MEMORANDUM DECISION

McRAE, District Judge.

This case was brought under the Federal Tort Claims Act. Plaintiffs' causes of action arose when a DC–3 aircraft crashed at the New Orleans, Louisiana, Airport (Moisant Field) in poor visibility conditions at approximately 6:55 A.M., C.S.T., on March 20, 1969. Of the twenty-seven persons on board, sixteen were killed, including the pilot and co-pilot and Marion Leo Hayes, a pilot-employee of the corporate owner of the plane, Avion, Inc. Originally, actions for damages were commenced against the United States by the estates of twelve of the deceased passengers and by six of the injured survivors who survived the crash. Prior to trial, nine of those plaintiffs discontinued their actions against the United States due to settlements reached with Avion, Inc. The estates or survivors of nine of the deceased passengers are now the plaintiffs in the case.

Plaintiffs claim that the plane crashed as a result of the negligence of the United States, through its Federal Aviation Administration air traffic controllers. The plaintiffs claim that the air traffic controllers were negligent in that: (1) they knew but failed to advise the crew of the significant weather information that nearby Lakefront Airport was above the aircraft's landing minimums at a time when Moisant Field's reported weather was below the plane's landing minimums; (2) that the approach controller, in answers to questions asked by the pilot, gave the pilot erroneous and incomplete information about the criteria required to make a landing; and (3) that the lack of coordination between approach control and local control led to a series of messages that constituted an improper

clearance and approval for the aircraft to approach and attempt to land at Moisant Field.

On the other hand, defendant denies any negligence on the part of the air traffic controllers. Alternatively, the defendant contends that no negligent act or omission on the part of the United States was a proximate cause of the crash.

Many of the facts pertaining to this accident were not disputed. The evidence included numerous admissions by the parties; documentary exhibits; the testimony of Frederick Goertz and Keith McCall, air traffic controllers on duty at the New Orleans Airport on the morning of March 20, 1969; the testimony of Dr. Kenneth Caldwell and Hugh Stanton, Jr., both surviving passengers of the crash and both of whom held private pilot's licenses; and tape recordings and transcripts of the radio transmissions between the aircraft and air traffic control facilities.

The plaintiffs offered expert testimony of Robert Rudich, an air traffic control expert, and Donald Rickert, a pilot expert. Expert testimony was introduced by the government through Edmund Burke, an air traffic control expert, and George Hay, a pilot expert.

On March 20, 1969, the DC–3 aircraft in question was owned by Avion, Inc. The aircraft was leased for this flight to William Jackson doing business as Travel Associates, of Memphis, Tennessee. Mr. Jackson leased the aircraft for the purpose of transporting on a charter flight sportsmen on a trip from Memphis, Tennessee, to Belize, British Honduras. An itinerary published before the trip indicated that the plane was to stop at New Orleans International Airport to go through customs, prior to proceeding to British Honduras. The cost of the trip was to be $175.00 per person, with the checks being payable to Travel Associates.

On the evening of March 19, 1969, the aircraft was ferried from Houston, Texas, to Memphis by Marion Leo Hayes, arriving at Memphis at approximately 6:55 P.M. The radio call sign of the aircraft was "N142D." On that evening, the aircraft departed the ramp at Memphis with Hayes and Allen Tennyson, a pilot residing in Memphis, on board. As an apparent demonstration procedure, one take-off and one landing were performed by N142D on that occasion.

Tennyson, who had been hired as pilot-in-command of the flight, had an air transport pilot's certificate and a type rating in DC–3 aircraft. However, prior to March 19, 1969, he had not flown in a DC–3 aircraft since December 1, 1968, and therefore did not meet the "recency of experience" requirement of 14 CFR § 61.47, Federal Aviation Regulations. The co-pilot hired for the flight, William H. Stovall, Jr., possessed a commercial pilot's certificate but he was not type-rated in DC–3 aircraft. From the proof, it appears that Hayes, the Avion pilot, agreed to accompany the flight from Memphis as far as New Orleans.

Prior to departure from Memphis, an individual who identified himself as Tennyson telephoned the Memphis Flight Service Station at 3:20 A.M. and got a weather report for New Orleans. The Flight Service Station attendant, Kathleen McGaughran, advised the caller that the 2:45 A.M. New Orleans weather reflected a visibility of three miles. She further provided the caller with an area weather forecast which indicated that a cold front would be moving into northwest Louisiana near daybreak, with ground fog forming over land ahead of the front, and that visibility in New Orleans would be below one mile after 4:00 A.M. At 3:26 A.M. the person identifying himself as Tennyson called back and filed an instrument flight rule flight plan to New Orleans, indicating an estimated flying time of two hours and ten minutes. No alternate destination was listed on this flight. The aircraft departed Memphis at approximately 4:36 A.M.

Enroute, at approximately 5:35 A.M., N142D called the Flight Service Station, Jackson, Mississippi, requesting the current New Orleans airport weather. Gerald Davis, the attendant, informed the aircraft that the 5:00 A.M. Moisant weather was

visibility one-sixteenth mile in fog and smoke, with a runway visual range of "1200 feet variable 1400 feet," with a fog obscuring ⁹/₁₀ths of the sky. In response to the aircraft's question concerning the New Orleans forecast for the next couple of hours, Davis informed the aircraft that the Moisant Field forecast was visibility ¹/₁₆th mile in ground fog and smoke, variable, to visibility one mile in ground fog and smoke until 9:00 A.M., then becoming clearer, visibility two miles in ground fog and smoke.

At approximately 6:08 A.M., control of N142D was transferred to the Houston Air Route Traffic Control Center from the Memphis Air Route Traffic Control Center. In the first transmissions from Houston the aircraft was advised that Moisant was "below minimums." The aircraft asked the Houston controller what was the closest other airport open nearby. At the time of this transmission the aircraft was approximately 23 miles north of McComb, Mississippi. The Houston controller informed the aircraft of poor weather conditions at McComb, informed him of the weather conditions at Baton Rouge which were apparently above minimums, and informed the aircraft that a pilot report had been received which indicated that the weather was good at Natchez, Mississippi.

The pilot indicated to Houston control that he had been advised that the weather might improve and that he would make his decision at New Orleans. N142D further communicated to Houston control that he would hold until the sun got up and then, "we'll fly on over and take a look." At 6:19 A.M. the aircraft, upon being asked by Houston control whether or not it wanted to hold north of New Orleans or come on down, stated, "well, we're going to come on over and hold; we'd like to come down and make one pass at the field and then proceed back and hold."

At approximately 6:35 A.M., Houston advised New Orleans Approach Control, which was physically located in the Moisant tower, that he had a DC-3 who said he "wants to come in and take a look at it." The aircraft was then handed off by radio communica-

tions and radar identification to the New Orleans approach controller, Frederick Goertz. At the time of this hand-off, the aircraft was approximately 30–35 miles from Moisant airport.

The initial radio transmissions between Moisant Approach Control (MSY AR/DR) and the aircraft N142D concerned the existing weather conditions. Coupled with the weather information previously received, this transmission advised the airplane that there was poor weather at the airport. With the times indicated in Greenwich Mean Time (six hours later than the Central Time referred to above), those messages were:

1235:33 142D Ah, New Orleans Approach, Douglas one forty-two Delta out of three point four for three thousand

MSY AR/DR Douglas one four two Delta, New Orleans Approach Control, maintain three thousand, proceed direct to the ILS outer compass locator and, ah, weather is, ah, sky partially obscured, visibility one-sixteenth, fog and smoke, altimeter three zero zero zero, runway one zero, visual range less than six hundred feet

1236:18 MSY AR/DR Did you get that, one four two Delta?

142D Ah, roger, four two Delta, we got it, ah

1236:36 142D Ah, Approach, one four two Delta, what'd you say you had on the RVR?

MSY AR/DR Less than six hundred feet

142D Ah, roger, what's your minimums? Twenty-four hundred?

MSY AR/DR That's correct. Category two is not authorized, ah, not adequate

1236:54 142D Ah, roger, ah (in background from flight) ask him if we can make a low pass

At this time clearly the aircraft was well informed of the weather at Moisant, and the pilot was well aware that the weather was below minimums. There then followed communications concerning the possibility of improvement in the weather:

1237:32 142D Ah, Approach, ah, one forty-two Delta, we can see the ground out here, ah, do you think that's going to improve any shortly?

MSY AR/DR Since about, ah, two o'clock this morning it's been getting progressively worse and, ah, aircraft have been able to see the ground all night. However, the horizontal visibility is, ah, as depicted, one-sixteenth prevailing visibility and, ah, less than six hundred RVR

At the time of this transmission, the aircraft indicated that it was encountering patchy fog; its position was approximately 25 miles from the airport. The controller's response repeated and further explained the weather picture for pilots previously and presently intending to approach Moisant Field.

The aircraft followed the above quoted response of the approach controller with an inquiry about making a "pass" at the airport, as follows:

142D Ah, roger, ah, will we be legal to make a pass and look at it?

MSY AR/DR I can clear you for an approach, ah, yes, ah, you can make the low approach if you'd like.

The plaintiffs' air traffic control expert testified at the trial that up to that point he had "no problems" with anything that was said or done by air traffic control. However, plaintiffs contend that commencing at 1238:15 there ensued a series of communications from the air traffic controllers which constituted negligence which proximately caused the crash. The most pertinent transmission occurred at 1238:15. This transmission is as follows:

1238:15 142D Ah, roger, well, if, ah, we can get contact with the ground will we be legal to land if that's six hundred feet?

MSY AR/DR Four two Delta, according to the approach plates if you get the runway or approach lights in sight, ah, correction on that, it says, ah, descent is not authorized, well actually what it should say is that, ah, the approach plate is, ah, self-explanatory. If you can see the runway or approach lights, affirmative, you can land

1239:05 142D Ah, roger

That transmission took place at a time when the aircraft was a considerable distance from the airport. Approach controller Goertz testified that in this remark he did not intend to grant the aircraft a clearance to land, but he attempted to answer the question posed by the aircraft.

Approximately four minutes later the aircraft requested a vector for an ILS (Instrument Landing System) and there followed routine communications between the aircraft and the controller as follows:

1243:31 142D Approach Control, Douglas four two Delta, would you give us a vector for an ILS?

MSY AR/DR Douglas four two Delta, affirmative. What's your heading right now?

142D Heading, ah, one nine five

MSY AR/DR Douglas four two Delta, turn right heading two two zero, descend and maintain two thousand

142D You had any aircraft land?

1234:51 MSY AR/DR No sir

1244:00 142D Are your high intensity strobe lights working?

MSY AR/DR Affirmative

1246:47 142D Approach Control, one forty-two Delta, you want us to remain three thousand?

MSY AR/DR Four two Delta, negative, descend and maintain two thousand

142D Ah, roger, out of three for two

1248:05 142D Four two Delta level two thousand

MSY AR/DR Four two Delta say again

142D Ah, level at two thousand

MSY AR/DR Okay, turn left heading one seven zero

142D Left to one seven zero, roger

About this time there occurred an exchange between the approach controller and the local controller located at Lakefront airport (NEW), some 12 miles east of Moisant airport, as follows:

NEW Approach, ninety

MSY AR/DR Go ahead
NEW Need the zone
MSY AR/DR Need the zone
NEW Affirmative
MSY AR/DR All right it's all yours
NEW Okay

From the testimony of approach controller, Goertz, this colloquy indicated that the local controller at Lakefront requested the control zone for a special VFR, and indicated that the visibility at Lakefront was between one and three miles.

Shortly thereafter, at approximately 1248:55, some ten minutes after the original discussion between the aircraft and the New Orleans approach controller concerning legality to make a pass or landing, there occurred a series of transmissions where the controller asked the aircraft what his intentions were. After the aircraft responded that it was going to make a "low pass," the controller cleared the aircraft for an "approach" to the airport. These messages were as follows:

1248:55 MSY AR/DR Four two Delta, do you have your current, ah, approach plate with you? ILS, ah, runway one zero: Thirteen February sixty-nine?

142D Ah, say again

MSY AR/DR Do you have your approach plate with you?

142D Affirmative

MSY AR/DR Okay, turn left heading one three zero. What are your intentions?

142D Ah, we'll make a low pass and see if we can pick up the lights

MSY AR/DR Roger, turn left heading one three zero, proceed inbound on the localizer. Cleared for ILS approach

1249:24 142D Roger

By this transmission Goertz, acting as approach controller, had cleared the aircraft for an "approach" to the airport, in accordance with the aircraft's stated intentions.

Shortly thereafter, at a point where the aircraft was three miles west of the outer marker, the approach controller advised the aircraft of its position and instructed it to contact the Moisant tower on the assigned radio frequency, as follows:

1249:58 MSY AR/DR Douglas four two Delta, three west of outer marker, contact Moisant Tower one one niner point niner

142D Roger

Shortly thereafter the aircraft contacted the Moisant tower (MSY LC/GC) as directed and advised the local controller of its present position and its intentions as follows:

1250:12 142D Ah, Moisant Tower, Douglas one four eight-one forty-two Delta

LC/GC Douglas on ground, say again

142D One four two Delta

LC/GC Okay, Douglas four two Delta, Moisant Tower, go ahead

142D Ah, roger, we're approaching the outer marker. We're going to make a low pass, see if we can pick up the lights

1250:44 LC/GC Roger

At the time of these transmissions, the local controller, Keith McCall, was manning both the local control (LC) position and the ground control (GC) position. He was wearing a radio headset with both the ground control frequency and local control frequency coming into the same earpiece. He testified that upon first being called by the aircraft he was not aware of where it was, but when the aircraft stated its position (approaching the outer marker) he knew where the aircraft was. McCall testified that he did not expect the aircraft to make a landing, as it had stated its intentions were to make a low pass. Approximately three minutes later the aircraft made its final transmission as follows:

1253:56 142D Four two Delta got the strobe lights in sight

LC/GC Roger

The runway involved in this case, runway 10, lies generally in an east-west direction. It is 9,227 feet long and 150 feet wide. Runway 10 is equipped for instrument landing system (ILS) approaches. At a point approximately 6.6 miles west of the runway's threshold is the "outer marker," an electronic device that advises a pilot when he has passed over it.

In a normal ILS approach in instrument weather, the approach controller, by giving the aircraft headings, directs the aircraft to a position where it will intercept the outer marker. Once the aircraft reaches the outer marker and intercepts the localizer and glide slope of the ILS, it then proceeds down the glide slope to decision height (DH). The pilot, using the instruments in the cockpit of the aircraft, flies along the glide slope to DH, and it is his responsibility to get the aircraft in a position "from which a normal approach to the runway can be made."

The approach controller gives the aircraft its last vector to intercept the localizer, and its position relative to the final approach fix. He then directs the aircraft to contact the local controller. In the instant case, Mr. Goertz vectored N142D to the outer marker and cleared N142D for the ILS approach. He informed the aircraft it was three miles west of the outer marker and directed it to contact the tower.

In normal practice, the aircraft then contacts the local controller and obtains a clearance to land at the airport.

The ILS for runway 10 at New Orleans was operative on the date of the accident. The localizer course is 099 degrees, and the published glide slope altitude over the outer marker inbound is 1800 feet above mean sea level (MSL). The glide slope is designed so that the altitude over the middle marker is 209 feet and the altitude over the inner marker is 103 feet MSL. The decision height (DH) is 200 feet above the ground or 202 MSL. Decision Height is the height expressed in feet above mean sea level where the decision must be made during the ILS instrument approach, to either continue the approach or execute a missed approach. Federal Aviation Regulations, 14 C.F.R. § 1.1.

According to passenger Dr. Caldwell, a former pilot, just prior to descending he could see cumulus clouds in front of the plane, and then "we dropped down into the weather." He observed that the aircraft was fishtailing, which indicated to him that the pilot was attempting to stay on the glide path and maintain his direction. As to the initial touchdown, Dr. Caldwell described it as coming down at a steep angle and bouncing (porpoising). According to Dr. Caldwell, the pilot immediately applied "a hundred percent power to the aircraft and the engines were running smoothly." He thought immediately that the pilot was making a "go-around."

Tire skid marks on the runway indicate that the aircraft initially contacted the ground approximately 1198 feet from the threshold of runway 10 with its landing gear down, and at a 25° angle to the center line of the runway. The second ground contact was 3100 feet beyond the initial contact. At this point the runway marks indicated that the landing gear had been retracted. The main wreckage of the aircraft came to rest at the intersection of runways 5 and 10, approximately 6300 feet from the threshold of runway 10. Although the aircraft was only 1800 feet away and in flames, the tower personnel could not see the wreckage due to the low visibility.

■ The Federal Tort Claims Act, 28 U.S.C., § 1346(b), provides that the United States shall be liable in the same manner and to the same extent as a private individual would be under like circumstances in accordance with the law of the place where the act or omission occurred. The aircrash occurred in the State of Louisiana, and the alleged negligent acts or omissions of the FAA controllers occurred in the State of Louisiana. Therefore, the law of Louisiana is applicable. *Richards v. United States*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962).

■ In Louisiana, as elsewhere, a tort has been generally defined as a "breach or a disregard of a legal duty." *Smith v. Indiana Lumbermen's Mutual Ins. Co.*, 175 So.2d 414, 416 (La.App.1965); *Prescott v. Central Contracting Co.*, 162 La. 885, 111 So. 269 (1927). This type action consists of three elements:

1. Existence of a legal duty from the defendant to the plaintiff;

2. Breach of that duty; and

3. Damage as a proximate result.

*Smith v. Indiana Lumbermen's Mutual Ins. Co., supra.*

 In Louisiana, as elsewhere, the plaintiffs must prove by a preponderance of the evidence that the defendant was negligent. *Blount Brothers Corp. v. State of Louisiana, Board of Commissioners,* 333 F.Supp. 327 (E.D.La.1971); *Campbell v. Diamond M. Drilling Co., Inc.,* 274 So.2d 842 (La.App.1973), *writ refused,* La., 278 So.2d 504. For negligence to give rise to a recovery, such negligence must be the proximate cause of the injury for which damages are sought. *Larkin v. U. S. Fidelity & Guaranty Co.,* 258 So.2d 132 (La.App.1972). Negligent conduct is that which creates an unreasonable risk of foreseeable harm to others. *Eubanks v. Gore,* 269 So.2d 258 (La. App.1972).

As previously stated, the plaintiffs claim that the air traffic controllers breached their duty to exercise reasonable care in this case. On the other hand, the United States claims that it was the failure of the pilot and crew to exercise reasonable care and their breach of duty was the sole proximate cause of the crash.

The pilot and crew of an aircraft were required to conduct their operations pursuant to the applicable Federal Aviation Regulations (FAR's) and good operating practices. They are required to abide by the provisions of Part 91 of the FAR's, which constitute the general operating and air traffic regulations. Section 610(a) of the Federal Aviation Act, 49 U.S.C. 1430(a), provides in part that it shall be unlawful to operate aircraft in violation of any regulation.

No person may act as pilot-in-command of an aircraft carrying passengers unless, within the preceding 90 days, he has made at least five takeoffs and five landings to a full stop in an aircraft of the same category, class, and type . . . . 14 C.F.R. § 61.47.

Tennyson, the pilot-in-command of N142D, did not meet this requirement.

Therefore, he intentionally violated this section. Although not a major violation, this indicates the attitude taken in this flight by those in charge of arranging for and conducting it.

Several sections from 14 C.F.R. Part 91 are applicable:

The pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of that aircraft. 14 C.F.R. § 91.3(a).

Each pilot-in-command shall, before beginning a flight, familiarize himself with all available information concerning that flight. This information must include, for a flight under IFR or a flight not in the vicinity of an airport, available weather reports and forecasts, fuel requirements, alternatives available, if the planned flight cannot be completed, and any known traffic delays of which he has been advised by ATC. 14 C.F.R. § 91.5.

No person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another. 14 C.F.R. § 91.9.

No pilot may, at an airport with an operating control tower, taxi an aircraft on a runway, or take off or land an aircraft, unless he has received an appropriate clearance from ATC . . . . 14 C.F.R. § 91.87(h).

Unless otherwise authorized by the Administrator (including ATC), each person operating an aircraft shall, when an instrument letdown to an airport is necessary, use a standard instrument approach procedure prescribed for that airport in Part 97 of that chapter of the regulations.

Unless otherwise authorized by the Administrator, no person operating an aircraft (except a military aircraft of the United States) may land that aircraft using a standard instrument approach procedure prescribed in Part 97 of this chapter unless the visibility is at or above the landing minimum prescribed in that part of the procedure used. If the landing minimum in a standard instrument approach procedure prescribed in Part 97

of that chapter is stated in terms of ceiling and visibility, the visibility minimum applies. 14 C.F.R. § 91.116(a) & (b).

No person may operate an aircraft below the prescribed minimum descent altitude or continue an approach below the decision height "unless":

(1) The aircraft is in a position from which a normal approach to the runway of intended landing can be made; and

(2) The approach threshold of that runway, or approach lights or other markings identifiable with an approach end of that runway, are clearly visible to the pilot. If, upon arrival at the missed approach point or decision height, or at any time thereafter, any of the above requirements are not met, the pilot shall immediately execute the appropriate missed approach procedure. 14 C.F.R. § 91.117.

The record is clear in this case that the pilot and crew of the aircraft intentionally violated some of the foregoing Federal Aviation Regulations and practices and negligently disregarded and violated others. This Court not only finds that those in charge of selecting the pilot and copilot and all persons on the airplane who took part in flying it were guilty of such reckless and wanton conduct, but that it would have been appropriate for criminal sanctions to · have been imposed.

■ Plaintiffs' primary contention is that the pilot of N142D could have reasonably construed the transmission of the approach controller at 1238:15 as a clearance to land. The Court finds that this colloquy between the aircraft and the controller, including the ambiguous response of the approach controller, should not have been construed as a clearance to land by a reasonably prudent pilot with an air transport rating.

Clearances to land are not normally issued by an approach controller, where there is an operating control tower with a local controller present. Further, a clearance to land is not granted prior to a clearance to approach being obtained from local control and especially not at a point 25 miles from the airport. Some ten minutes after the discussion regarding legality, the controller asked the aircraft its intentions and in the standard terminology cleared him for an approach by saying, "cleared for ILS approach."

It was extremely unreasonable for the pilot to assume that he had a landing clearance at that point, even if he had thought one had been implied earlier.

From the testimony of controllers Goertz and McCall the most plausible inference is that at no time did they intend to grant N142D a landing clearance, nor had they done so.

■ An air transport pilot is required to know and abide by the rules and regulations. A pilot is charged with knowledge he should have had if he were exercising the requisite degree of care. *American Airlines v. United States,* 418 F.2d 180, 193 (5th Cir. 1969).

■ Although in the opinion of this Court it is clear that the approach controller· did not intend to clear N142D for landing, apparently the pilot did attempt a landing.[1] Even if this could have been construed as a landing clearance, the decision as to whether or not to actually attempt a landing was solely the decision of the pilot. Therefore, such a clearance would not have been the proximate cause of the crash.

In accordance with 14 C.F.R. § 91.117(b), at decision height, the pilot must visually observe whether the aircraft is in position to make a normal approach or landing and must visually see the threshold of the runway or approach lights, not only to comply with the regulation, but because absolutely blind instrument landings are not feasible. If both of these requirements are met at DH he can continue down the glide slope toward the runway. However, if between

1. Even though the actions of the pilot are so inexplicable, the landing gear was down when the plane first touched the ground.

DH and the ground, one of these requirements is not met he should execute a "missed approach."

■ From the angle of the skid marks on the runway and the testimony of the passengers, this Court finds that the requirements of 14 C.F.R. § 91.117(b) were not maintained. To descend below DH when the requirements were not met or maintained constituted a violation of that section and constituted another one of the forms of negligence on the part of the crew which was the proximate cause of the crash. Even Mr. Rickert, the plaintiffs' pilot expert, initially testified in regard to the pilot's violation of the regulation as follows:

"Q. And you think that was a violation of Federal Aviation regulations for him to continue beyond that point?

A. I would have to say yes it was a violation.

Q. Sir, as a pilot, does a clearance of an air traffic controller authorize you at any time to violate a Federal Aviation regulation?

A. No, sir.

Q. So, therefore, if the pilot violated the regulation, that could not be blamed on the controller, could it?

A. I would have to say no, sir . . . ."

Subsequently, Mr. Rickert did testify that although he was of the opinion that the pilot did violate the regulation that he did not think it was intentional. However, this does not eliminate the negligent and reckless disregard for the safety of his passengers.

Not only was it a violation of § 91.117(b), but to continue below decision height when not in line with the runway or when the lights were not in sight was a careless and reckless operation within the meaning of 14 C.F.R. § 91.9.

It was further a violation of 14 C.F.R. § 91.87 of the regulations to try to land without a clearance.

The Court further finds that a reasonably prudent air transport pilot should know that he has to have "minimums" before he can attempt a landing. The pilot of N142D was well aware of the weather and the required minimums. During the initial transmissions with approach control, it was the pilot who said, "What's your minimums? 2400?"

Both the government's pilot expert and the plaintiffs' pilot expert testified concerning the actions of the pilot and crew after the aircraft initially contacted the ground. Mr. Rickert testified that in his opinion a lapse of pilot technique in some manner after the initial touchdown contributed to the accident, stating that there was a possibility that the plane could have been safely landed and a better possibility that a safe go-around could have been made. Mr. Hay testified that it was common to bounce a DC–3 on landing, the aircraft being nicknamed the "gooney-bird" due to that characteristic. However, in his opinion the pilot and crew should have been able to execute a go-around. It appears to the Court that there was a gross lapse in pilot technique, due to incompetence of the crew that had not flown together before. It was gross negligence to attempt a landing in such poor conditions to begin with—particularly with such a makeshift crew.

■ The function of an air traffic controller is to assist the pilot in the performance of his duties, but nothing the controller does can relieve the pilot of any of the duties that he has. *Black v. United States,* 441 F.2d 741 (5th Cir. 1971); *United Air Lines, Inc. v. Wiener,* 335 F.2d 379, 389 (9th Cir. 1964).

■ The pilot in command of the aircraft is directly responsible for, and is the final authority as to, the operation of that aircraft. *Coatney v. Berkshire,* 500 F.2d 290, 292 (8th Cir. 1974); *Bibler v. Young,* 492 F.2d 1351, 1358 (6th Cir. 1974).

■ The duties and responsibilities of air traffic controllers are set forth in the Federal Aviation Regulations and in the manuals set forth by the Federal Aviation Administration. A controller's duty to exercise reasonable care extends to aircraft, crews, and passengers. *Freeman v. United States,* 509 F.2d 626 (C.A.6, 1975); *Stork v. United States,* 430 F.2d 1104 (9th Cir. 1970).

As previously stated, the plaintiffs contend that the failure to inform N142D of the weather at Lakefront Airport constituted negligence and was a proximate cause of the crash. This contention is based primarily on sections 41 and 42 of the Terminal Air Traffic Control Manual which provide in part:

§ 41. *Weather Assistance*

Provide the following assistance in areas of significant weather to the extent possible:

(a) Plan ahead and suggest use of other routes to avoid known areas of significant weather.

(b) Expedite action on request for route or altitude deviation to avoid areas of significant weather. When a requested deviation cannot be approved due to traffic conditions, the altitude or route of the conflicting aircraft may be changed to permit approval of the requested deviation if there is reasonable assurance that this action will not place the conflicting aircraft in hazardous weather conditions.

§ 42. *Pilot Weather Reports*

You may relay any elements of weather information as received in a PIREP to other ATC facilities or aircraft without consulting the weather reporting station:

(a) Relay pilot-reported significant weather information to other aircraft concerned and to the appropriate center, FSS, WBAS, or military weather unit, as appropriate. (N)

42.a. Note.—Significant weather information includes pilot reports concerning areas of strong frontal activity, squall lines, heavy thunderstorms, widespread fog, moderate to heavy icing, turbulence (including clear air turbulence) of moderate or greater intensity, or similar conditions pertinent to safety of flight.

Plaintiffs through their attorneys contend that had the aircraft been advised of the Lakefront weather, which was above minimums, that the aircraft no doubt, would have diverted to that airport and the plane would not have crashed. This is hindsight and speculation.

Although both the local controller and the approach controller had some knowledge of the weather conditions at Lakefront, in the total circumstances the failure to offer this unrequested information was not negligence. This is particularly true in the light of the remarks of the pilot that he wanted to make a pass. After that would have been the time that one would expect that alternate routes would have been discussed.

Even if Moisant approach control had given the Lakefront weather to the aircraft, it is a matter of speculation as to what the aircraft might have done, particularly in the light of the alternatives suggested by the Houston controller before the plane was transferred to New Orleans control.

Even if the Court had concluded that such omission was a breach of duty, this would not have been a proximate cause of the crash.

The Court concludes that Goertz complied with the requirements pertaining to advising the aircraft fully of the poor weather conditions. He requested the pilot to state his intentions and granted him an *approach* clearance in accordance with his stated intentions.

Plaintiffs contend that even if Goertz did not intend a clearance to land, it was reasonable for the aircraft to assume one had been given. However, this Court finds that such assumption was not a reasonable one on the part of an instrument rated air transport pilot.

Plaintiffs contend that, assuming no clearance was given, the failure of Goertz to provide a complete and accurate answer to the legality question was negligence which caused the accident. There is no duty on an air traffic controller to be able to quote verbatim regulations primarily designed for the pilot, but if he undertakes to do so it is negligent to do so in a fashion that is erroneous or incomplete. The last portion of his transmission, "if you

can see the runway or approach lights, affirmative you can land," came from his memory of what the regulations stated concerning requirements for making a landing and it was erroneous and incomplete. Therefore, the Court concludes that to this extent the approach controller was negligent, but that this negligence was not the proximate cause of the crash.

As heretofore discussed in this opinion, even had Goertz's transmission been considered a clearance, only the pilot can make the decision to land the aircraft. A duty cannot be imposed on a controller on the ground to exercise operational control of the aircraft at decision height.

Plaintiffs' third contention concerns a lack of coordination between controllers. There was much said at trial regarding the failure of the approach controller to advise the local controller of the arrival of N142D by use of the "red light" procedure. This procedure was set forth in the Moisant Facility Operations Manual, and it was not complied with. The Court concludes that this was negligent. However, it does not follow that it was a proximate cause of the crash.

 The purpose of this procedure was to advise the tower of the sequence of approaching aircraft so that the local controller, who is also responsible for aircraft taking off, would be aware of the total traffic picture, but failure to comply with this procedure could not overcome superseding negligence on the part of a reckless pilot and crew.

 An air controller cannot order an aircraft to land. The pilot must exercise ordinary care for the safety of his passengers and for his own safety under the circumstances which confront him. See *Wasilko v. United States,* 300 F.Supp. 573 (N.D. Ohio 1967), *aff'd,* 412 F.2d 859 (6th Cir. 1969).

The sole proximate cause of the accident was the extremely poor judgment and negligence of the pilots in violation of the regulations and proper operating practices.

This was shown at the outset of the trip and continued until the crash.

Although *Black v. United States,* 441 F.2d 741 (5th Cir. 1971) has a fact situation which is not closely analogous, it declares significant principles of law applicable to this case. In *Black* the Court of Appeals for the Fifth Circuit found no "proximate negligence" on the part of a government flight service station attendant concerning weather information communicated to an aircraft which later crashed. In *Black,* the Court applying Louisiana law as to proximate cause held that any negligence on the part of the FAA operator was superseded by the negligence of the pilot, who decided to proceed with the flight even after observing the poor visibility conditions.

The Court applied the Louisiana law of proximate cause as defined in *Harvey v. Great American Indemnity Co.,* 110 So.2d 595, 600 (La.App.1958), which stated:

> The proximate cause of an injury is the primary or moving cause, or that which, in a natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury and without which the accident could not have happened, if the injury be one which might be reasonably anticipated or foreseen as a natural consequence of the wrongful act.

 This Court finds in the instant case that the acts and words of the controllers in no way reasonably and probably caused the pilot to take the negligent actions which he did in attempting to land N142D.

The patent recklessness of the pilot and crew of N142D superseded the negligence of the United States, which was not proximate. The language quoted in *Black,* at 745–46, from *Rowe v. United States,* 272 F.Supp. 462, 471 (W.D.Pa.1964), is especially applicable to the present case, wherein it was said:

> The intervening act of the unqualified pilot in deliberately descending into a solid overcast was not only reckless conduct, but may be regarded as so highly extraordinary as to become a superseding cause of the deaths of his passengers, Rowe and Smith. We do not think that

any employees of defendant could reasonably have foreseen such conduct on the part of the pilot.

In reading this decision the Court is not unmindful of the recent opinion of the Court of Appeals for the Sixth Circuit in *Freeman v. United States, supra.* In that case the United States conceded the negligence of an air controller who had misidentified an aircraft on radar, thereby causing the aircraft to be in the wrong position for a group parachute jump. Eighteen parachutists jumped from the plane into cloud cover. Instead of being over their intended drop site, they were four miles offshore over Lake Erie. In the application of the law of Ohio, one of the holdings of the Court of Appeals was that the conduct of the pilot and the jump master was not intervening negligence which would have produced the result without the negligence of the air controller, which caused the pilot to think he was over the intended target. This Court is of the opinion that the instant case is distinguishable from the *Freeman* case.

Judgment will be entered in this action in favor of the defendant, the United States of America.