PAN AMERICAN WORLD AIRWAYS, INC., Plaintiff,

v.

The PORT AUTHORITY OF NEW YORK AND NEW JERSEY and the United States of America, Defendants.

The PORT AUTHORITY OF NEW YORK AND NEW JERSEY, Third–Party Plaintiff,

v.

UNITED STATES AVIATION UNDERWRITERS, INC., United States Aviation Insurance Group, and Frank B. Hall and Company, Third–Party Defendants.

The PORT AUTHORITY OF NEW YORK AND NEW JERSEY, Third–Party Plaintiff,

v.

The UNITED STATES of America, By and Through the DEPARTMENT OF TRANSPORTATION and the Federal Aviation Administration, Third–Party Defendants.

PAN AMERICAN WORLD AIRWAYS, INC., Plaintiff,

v.

The UNITED STATES of America, Defendant.

Nos. 86 Civ. 2381 (NT), 86 Civ. 0938 (NT) (JBW).

United States District Court, E.D. New York.

March 5, 1992.

Windels, Marx, Davies & Ives, New York City by Raymond T. Munsell, James W. Borkowski, for Pan American World Airways.

Robert J. Gross, Patrick E. Bradley, U.S. Dept. of Justice, Civil Div., Torts Branch, Washington, D.C., for U.S.

James M. Begley, Megan Lee, New York City, for Port Authority of N.Y. and N.J.

FINDINGS OF FACT AND
CONCLUSIONS OF
LAW

TSOUCALAS, District Judge.

This is an action brought by plaintiff Pan American World Airways, Inc. ("Pan Am") against defendant The United States of America, and defendant The Port Authority of New York and New Jersey ("Port Authority") to recover for several million dollars in damages allegedly sustained by the right-wing engine and hull of a Pan Am DC–10. The damage to the engine and hull allegedly occurred because of ice ingestion, after the wing-engines of the DC–10 were thrown into reverse thrust while the aircraft was taxiing at John F. Kennedy International Airport ("Kennedy Airport" or "JFK").

A trial commenced in this Court on January 23, 1991 and continued on January 24, 28 and 29, 1992. The case was tried non jury in respect of all claims against the United States of America and to the jury in respect of all claims against the Port Authority. On January 29, 1991, immediately after plaintiff rested, the United States moved under Fed.R.Civ.P. 52(c) for judgment on partial findings, and the Port Authority moved under Fed.R.Civ.P. 50(a) for judgment as a matter of law. Having heard all the testimony and arguments of counsel, this Court found that the plaintiff failed to sustain its burden of proving a *prima facie* case against the United States and the Port Authority. Accordingly, both motions to dismiss were granted.

In the opinion of the Court, the Findings of Fact and Conclusions of Law set forth below, including those stated on the record at the close of trial and which are hereby adopted, incorporated and restated, are dispositive.

FINDINGS OF FACT

A. *Summary of Incident*

1. The parties stipulated to the following facts:

a. At all relevant times the plaintiff, Pan American World Airways, Inc. ("Pan Am"), was and is a corporation duly organized under the laws of the State of New York. Pan Am is a domestic and international air carrier, certified under the Federal Aviation Regulations (FAR) Part 121 carrying passengers and cargo for hire.

b. At all relevant times the defendant, the Port Authority, was and is a body corporate and politic created by a compact between the States of New York and New Jersey with the consent of the Congress of the United States of America.

c. The Port Authority generally operates, controls and maintains certain facilities, in both the states of New York and New Jersey, including John F. Kennedy International Airport ("JFK" or "Kennedy Airport"), which is located in Jamaica, Queens, City and State of New York. Certain portions of the facilities may be operated or controlled by others using the facilities.

d. Pan Am and the Port Authority entered into a written agreement dated as of January 1, 1953 pursuant to which Pan Am leased certain premises at Kennedy Airport. Pursuant to that lease, as amended, and other agreements between Pan Am and the Port Authority, Pan Am continues to lease certain premises at Kennedy Airport from the Port Authority.

e. Pursuant to the terms of the aforementioned January 1, 1953 agreement, and other agreements, Pan Am was and is authorized and entitled to use the public aircraft facilities at Kennedy Airport. The public aircraft facilities include certain runways and taxiways at Kennedy Airport.

f. The defendant United States, through the Federal Aviation Administration, employed and still employees individuals (referred to collectively as Air Traffic Controllers) to provide Air Traffic Control services at Kennedy Airport.

g. On January 16, 1984, at approximately 9:00 a.m., Pan Am aircraft No. 65 landed at Kennedy Airport on Runway 4–R after a flight from Logan Airport, Boston, Massachusetts. The flight was designated No.

219A. There were approximately ninety (90) passengers on board the flight. Prior to landing, Flight 219A contacted Kennedy Local Control and received clearance to land on runway 4 Right. This runway is one of two parallel runways, the other parallel runway being 4 Left. Runway 4 Right may also be referred to as 22 Left and runway 4 Left may also be referred to as 22 Right.

h. Pan Am aircraft No. 65 was a type DC–10. Pan Am aircraft No. 65 was equipped with three jet engines, one on each wing and one in the tail.

i. The engine on the right wing of the aircraft was manufactured by General Electric Company and was type CF6–6D. That engine was designated by the serial No. 451–291. That engine had been leased by Pan Am from American Airlines.

j. Among the taxiways which are part of the public aircraft facilities at Kennedy Airport were three taxiways designated on January 16, 1984, as Yankee ("Y"), Echo ("E") and Foxtrot ("F").

k. The following cockpit crew was on Flight 219A on January 16, 1984: (1) Captain Stephen D. Bellows, pilot in command; (2) First Officer Jon K. Piper, second in command; (3) Flight Engineer Oscar Jennings Hill.

1. The aircraft braking system was operating normally at all times at issue.

2. This action arises from a taxiway incident involving a Pan American World Airways, Inc. DC–10 aircraft ("DC–10", or "Flight 219A" or "the Aircraft") and sanding vehicles operated by the Port Authority of New York and New Jersey.

3. The incident, which occurred on January 16, 1984 at Kennedy Airport, resulted in substantial damage to the Aircraft's No. 3 (right) engine and associated components, as well as to the hull of the DC–10.

4. The damage occurred when the Captain of Flight 219A, allegedly believing that Port Authority sanding vehicles were going to collide with the Aircraft, attempted to stop the DC–10. According to the Captain, snow and ice on the taxiway rendered the Aircraft's wheel brakes ineffective in stopping the Aircraft, and he elected to employ reverse thrust in an attempt to stop the Aircraft from sliding into the vehicles.

5. According to Pan Am, the Aircraft engine and hull were seriously damaged by the use of reverse thrust because of ice ingestion.

6. The Port Authority sanding vehicles never collided with the DC–10.

B. *Weather and Airport Conditions*

7. Flight 219A originated at Logan Airport, Boston, Massachusetts on the morning of January 16, 1984 and landed at JFK at 8:58 AM EDT.

8. Weather at the time of the incident was reported to be: ceiling 2500 feet broken, visibility 8 miles, temperature 17° F, with winds from the north at 8 knots.

9. Kennedy Airport had experienced snow and freezing temperatures during the previous week. As was reported in aviation weather reports and a Notice to Airmen ("NOTAM") in effect on January 16, 1984, all taxiways and ramps at JFK had a thin coating of ice over compacted snow and ice.

10. The flight crew of the Aircraft received the NOTAM and was aware of the conditions at the airport.

C. *The Flight Crew*

11. As previously stated, the flight crew of Flight 219A consisted of Captain Stephen D. Bellows, First Officer John K. Piper, and Flight Engineer Oscar J. Hill.

12. Captain Bellows was seated in the cockpit's left front seat at the time of the incident.

13. Captain Bellows was familiar with aircraft operating and radio communication procedures at JFK. He had operated aircraft at that airport on numerous occasions, and he had operated on the airport many times previously when there had been snow and ice on the runways and taxiways.

14. First Officer Piper was positioned in the right front seat at the time of the incident.

15. Like Bellows, First Officer Piper was well acquainted with operating and radio communication procedures at JFK.

16. Flight Engineer Hill was at the flight engineer's position located on the right, rear side of the cockpit.

17. As Captain of Flight 219A, Captain Bellows had complete discretion as to whether the Aircraft would land at JFK on the day of the incident and complete discretion as to the manner and route that the Aircraft would take in taxiing to the Pan Am terminal.

### D. *The Aircraft*

18. Flight 219A was a McDonnell Douglas DC–10 jumbo jet, FAA registration No. N65NA, Pan Am aircraft No. 65. The cockpit of the DC–10 aircraft stands approximately 22 feet in the air. The flight deck of the Aircraft is surrounded on three sides by windows, allowing the flight crew to see to the right, forward and to the left of the Aircraft.

19. The Aircraft was equipped with three jet powerplants, one under each wing and one in the tail. The powerplants were General Electric model CF6–6D high bypass turbofan engines, each developing approximately 40,000 pounds of thrust on takeoff.

20. The damaged engine at issue, serial number 451–291, was installed on a pylon under the right wing of the Aircraft. The right wing-mounted engine is referred to as the No. 3 engine.

21. Each engine on the DC–10 aircraft is equipped with a thrust reverser which, when activated, slows the aircraft.

22. DC–10 aircraft are also equipped with a cockpit voice recorder (CVR). The CVR records all flight crew conversations or radio communications as well as all incoming radio communications on a 30–minute–loop magnetic tape.

### E. *The Sanding Vehicles*

23. At the time of the incident, the Port Authority was operating a team of sanding vehicles near the incident site. The lead car was being followed by two sanding trucks or plows.

24. The lead car, an ordinary sedan, was yellow and was operating with flashing yellow roof lights.

25. The two sanding trucks or plows were about the size of large dump trucks and were painted yellow.

### F. *Voice Tapes*

26. All communications between JFK air traffic control tower and aircraft on the JFK Tower and ground control frequencies are taped in a communications center in the tower. In the ordinary course, tapes are retained for only 15 days. In the event of an incident or accident involving tower communications, a request may be made by either FAA personnel or non-FAA personnel to save the tapes. If no such request is made, the taped transmissions will not be saved.

27. It is undisputed that no request to save these tapes were made in this case, and that the tapes were returned to service.

### G. *Notice to Airmen (NOTAM)*

28. NOTAM information is defined as that aeronautical information that could affect a pilot's decisions concerning a flight.

29. Prior to landing at JFK, the flight crew of Flight 219A received NOTAMs regarding the weather and surface conditions at JFK.

### H. *Runways and Taxiways*

30. Prior to landing, Flight 219A contacted Kennedy Local Control and received clearance to land on runway 4 Right.

31. Among the taxiways which are part of the public aircraft facilities at John F. Kennedy Airport were three taxiways designated on January 16, 1984, as Yankee, Echo and Foxtrot.

### I. *Sequence of Events*

32. Neither the CVR nor the JFK air traffic control tower tape were available at trial. However, the testimony at trial revealed, by a preponderance of the evidence,

that certain air traffic control ("ATC") communications occurred, as set forth below.

33. Flight 219A touched ground and landed on Runway 4–R at JFK airport at approximately 8:58 A.M. on the morning of January 16, 1984.

34. After landing, the Aircraft was directed by the control tower to go down taxiway Echo and from Echo to taxiway Yankee. In addition, the control tower informed the Aircraft that there were sand trucks in the vicinity of Runway 4–L and Foxtrot. The tower also notified the flight crew that the sand trucks would be crossing Runway 4–L on Foxtrot and that the Aircraft was to give way and follow behind the sand trucks if it encountered them at or near the intersection of runway 4–L at Foxtrot. These communications were made when the Aircraft was approximately a half mile from the intersection of Runway 4–1 and taxiways Yankee and Foxtrot.

35. At this time, the air traffic control tower also notified the flight crew of Flight 219A that taxiway Yankee was icy, with a thin layer of snow and ice.

36. All of the crew members of Flight 219A testified that they were looking out of the cockpit window while the Aircraft was taxiing.

37. According to the flight engineer, as the Aircraft was taxiing, he was busy communicating on the aircraft radio with Pan Am Operations, located at the Pan Am World Port on JFK airport. He testified that he did look out the windshield of the cockpit, but did not see any sand trucks.

38. Captain Bellows testified that he was looking out of the windshield of the DC–10, that he was very diligent in maintaining a lookout for the sand trucks, and that he did not see the sand trucks. He also testified that he first saw the sand trucks on a grassy part of the airport near the intersection of taxiways Yankee and Foxtrot and runway 4–L, and that the sand trucks were standing still.

39. Captain Bellows further testified that as the plane was approaching the intersection of taxiways Foxtrot and Yankee and runway 4–L, he saw the sand trucks start in motion and speed across the path of the Aircraft forcing him to put the plane in reverse thrust, causing the incident.

40. First Officer Piper testified (by deposition) that he did not notice the sand trucks until the Aircraft was near the intersection of Yankee and Foxtrot and 4–L. He further testified that he saw the sand trucks speed across runway 4–L, causing a lot of snow to be blown up; that the sand trucks were going at a fast rate of speed; and that Captain Bellows had no alternative but to put the plane into reverse thrust. First Officer Piper also testified that he did not see the sand trucks until the Aircraft was close to the intersection.

41. As far as the CVR being saved so that we could know what exactly transpired, Captain Bellows testified that the tapes were not saved. He testified that he did not order that the cockpit tape be saved in the black box because he did not think there was extensive damage.

42. The testimony of Piper was that the CVR was not saved.

43. The flight engineer, however, said that some time after the incident, while the plane was taxiing to the terminal, he was told by Captain Bellows to pull the circuit breaker for the CVR, but then was told to turn it on again.

44. None of Pan Am's witnesses notified the air traffic control tower to preserve the voice tapes that they had beyond the normal 15–day retention cycle.

45. In fact, Pan Am's own Chief Pilot (New York), John G. Harris, testified that he made a mistake and may have been negligent in not notifying JFK air traffic control tower to preserve their tapes.

46. There is no doubt that taxiway Yankee was in bad condition with regard to snow and ice.

47. The testimony of Pan Am's witnesses with regard to taxiway Yankee was that the taxiway was not sanded, that there was a glassy ice condition on the taxiway, and that there was also broken ice and chunks of ice on the taxiway.

48. The testimony of Mark H. Goodrich, a pilot expert for the Port authority, was taken out of turn and presented during plaintiff's case. Mr. Goodrich testified that, in his opinion, the only way the incident could have occurred was if the Aircraft was taxiing too fast down taxiway Yankee. However, Mr. Goodrich also testified that a pilot may use reverse thrust in an emergency situation and that if a pilot is about to run into something with an aircraft, he should do whatever is necessary to stop the plane. Also, Mr. Goodrich testified that if it is dangerous for aircraft to operate on a taxiway it is the responsibility of the airport operator, which in this case he understood to be the Port Authority, to close the taxiway.

### J. The Case Against The United States

49. Plaintiff's own witnesses testified that the area in question was substantially flat and there was nothing to obstruct the view of the flight crew as to any vehicles in that area.

50. According to Captain Bellows and First Officer Piper, they did not see the sand trucks or plows until the Aircraft was 70–100 feet from the intersection.

51. Captain Bellows testified that when he put the brakes on, the Aircraft started to slide; accordingly, he put the wing engines in 80% reverse thrust because he thought the Aircraft was going to slide into the sand trucks.

### K. The Case Against The Port Authority

52. With respect to the Port Authority, the jury is the trier of the facts. The Port Authority and Pan Am asked for a jury trial with regard to the Port Authority, and in any case where a jury is involved, they are the trier of the facts, not the Court.

53. In this case, the Port Authority moved to dismiss on the grounds that Pan Am failed to prove a *prima facie* case as against the Port Authority.

54. For the reasons stated on the record following the close of plaintiff's case, the Court granted the motion of the Port Authority for judgment as a matter of law, and dismissed the case against the Port Authority on the grounds that Plaintiff failed to prove a *prima facie* case.

## CONCLUSIONS OF LAW

### A. Jurisdiction

1. This Court has jurisdiction over plaintiff Pan Am's claims against the United States pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346, 2671, *et seq.*

2. This court has ancillary jurisdiction over plaintiff Pan Am's claims against the Port Authority.

### B. Applicable Law

3. Because the incident occurred in New York, and because the JFK tower is in New York, New York law applies to this case. *See* 28 U.S.C. § 1346(b); *see also Texasgulf Inc. v. Colt Electronics Co*, 615 F.Supp. 648, 660 (S.D.N.Y.1984).

### C. Actionable Negligence in New York

4. To establish a cause of action for negligence in New York, plaintiff has the burden of proving, by a preponderance of the evidence, that the conduct of FAA personnel in the JFK air traffic control tower "fell below the standard established by law for the protection of others against unreasonable risks." *Texasgulf Inc. v. Colt Electronics Co*, 615 F.Supp. 648, 660 (S.D.N.Y.1984). Plaintiff must prove a legal duty owed by the defendant to the plaintiffs, a negligent breach of this duty, and injury proximately resulting therefrom. *Id.* (citations omitted).

5. Under New York law, plaintiff must also prove that the failure to use due care on the part of FAA personnel in the JFK air traffic control tower was a "substantial contributing factor", let alone a factor, in producing the subject injury. *Id.* (citations omitted).

### D. Pilot Duties and Responsibilities

6. Pilots "must know and abide by the Federal Aviation Regulations" (FARs). *Texasgulf Inc. v. Colt Electronics Co*, 615 F.Supp. 648, 660 (S.D.N.Y.1984) (citations omitted). The FARs have the force and

effect of law. *Tilley v. United States*, 375 F.2d 678 (4th Cir.1967); *United States v. Schultetus*, 277 F.2d 322 (5th Cir.1960), *cert. denied*, 364 U.S. 828, 81 S.Ct. 67, 5 L.Ed.2d 56 (1960). Under New York law, a violation of the FARs is evidence of negligence. *Texasgulf*, 615 F.Supp. at 660 n. 21.

7. The pilot in command of an aircraft is directly responsible for and has final authority over the safe operation of his aircraft. 14 C.F.R. § 91.3; *Yates v. United States*, 497 F.2d 878, 883 (10th Cir.1974); *Spaulding v. United States*, 455 F.2d 222 (9th Cir.1972); *American Airlines v. United States*, 418 F.2d 180, 193 (5th Cir.1969); *United States v. Schultetus*, 277 F.2d 322, 327 (5th Cir.1960); *Texasgulf Inc. v. Colt Electronics Co.*, 615 F.Supp. 648, 660 (S.D.N.Y.1984). The "ultimate decision is the pilot's, since he knows the condition of his aircraft, its capabilities and must deal with the unusual and unexpected during flight." *Neff v. United States*, 420 F.2d 115, 120 (D.C.Cir.1969), *cert. denied*, 397 U.S. 1066, 90 S.Ct. 1500, 25 L.Ed.2d 687 (1970); *Wenninger v. United States*, 234 F.Supp. 499, 516–517 (D.Del.1964), *aff'd*, 352 F.2d 523 (3d Cir.1965).

8. Flight crew members have a continuing duty to be aware of dangers which they can perceive with their own eyes. *Spaulding v. United States*, 455 F.2d 222 (9th Cir.1972); *Associated Aviation Underwriters*, 462 F.Supp. 674, 681 (N.D.Tex.1978); *Thinguldstad v. United States*, 343 F.Supp. 551, 558 (S.D.Oh.1972); *Black v. United States*, 441 F.2d 741 (5th Cir.1971), *cert. denied*, 404 U.S. 913, 92 S.Ct. 233, 30 L.Ed.2d 186 (1971); *DeVere v. True–Flite, Inc.*, 268 F.Supp. 226 (E.D.N.C. 1967). Pilots cannot fail to use their own eyes and ears to be aware of danger. *In Re Aircrash Disaster at John F. Kennedy Int'l Airport on June 24, 1975*, 635 F.2d 67, 74 (2d Cir.1980); *Spaulding*, at 227. Pilots are charged with a duty to see that which is plainly visible. *Finfera v. Thomas*, 119 F.2d 28 (6th Cir.1941).

9. Pilots are required by regulation and common sense to maintain a sharp lookout so as to "see and avoid" other aircraft. 14 C.F.R. § 91.67(a).

10. A pilot's duty to see and avoid ground vehicles is not excused because he may have to look thoroughly and diligently in the area where ground vehicles are located. *See United States v. Miller*, 303 F.2d 703, 709 (9th Cir.1962).

11. Whenever ATC issues a clearance to a pilot, which in the pilot's judgment would jeopardize the safety of the aircraft and its occupants, that pilot has an absolute duty to reject that clearance, to inform ATC, and request a new clearance. *In Re Air Crash at Dallas/Fort Worth Airport*, 720 F.Supp. 1258, 1290 (N.D.Tex. 1989), *aff'd*, 919 F.2d 1079 (5th Cir.), *cert. denied sub nom. Connors v. United States*, —— U.S. ——, 112 S.Ct. 276, 116 L.Ed.2d 228 (1991); *In Re Air Crash Disaster at Boston, Mass., July 31, 1973*, 412 F.Supp. 959, 989 (D.Mass.1976).

12. If a pilot does not fully understand a clearance, he shall immediately request clarification from ATC. 14 C.F.R. § 91.75.

13. Pursuant to the FARs, pilots are required, before undertaking a flight, to obtain all available information concerning that flight. 14 C.F.R. § 91.5. Pilots are specifically required to obtain weather reports, weather forecasts, and NOTAMS as a part of their pre-flight duties. 14 C.F.R. § 91.5; *DeVere v. True–Flite, Inc.*, 268 F.Supp. 226, 228 (E.D.N.C.1967).

14. Airline pilots are charged with that knowledge which in the exercise of due care they should have known. *American Airlines v. United States*, 418 F.2d 180, 193 (5th Cir.1969); *Air Service, Inc. v. United States*, 18 Av.Cas. (CCH) 17,556, 17,566 (N.D.Miss.1983). They are charged with the knowledge of those facts which are material to the safe operation of their flights. *American Airlines*, 418 F.2d at 193; *Associated Aviation Underwriters*, 462 F.Supp. 674 (N.D.Tex.1978).

15. No person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another. 14 C.F.R. § 91.9; *Air Service, Inc. v. United States*, 18 Av.Cas. (CCH) 17,556, 17,565 (N.D.Miss.1983); *In re Air Crash Disaster at New Orleans (Moisant Field), La.*, 422

F.Supp. 1166, 1174 (W.D.Tenn.1975); *Baker v. United States*, 417 F.Supp. 471, 485 (W.D.Wash.1975).

### E. *Controller Duties and Responsibilities*

 16. Controllers need not warn of things the pilot ordinarily would know. *Crossman v. United States*, 378 F.Supp. 1312 (D.Ore.1974). Similarly, there is no duty to warn a pilot of a condition that he should already be aware of based on his training, experience and personal observations. *Neff v. United States*, 420 F.2d 115 (D.C.Cir.1969), *cert. denied*, 397 U.S. 1066, 90 S.Ct. 1500, 25 L.Ed.2d 687 (1970).

17. Controllers have the right to rely on the assumption that pilots know and will abide by all applicable Federal Aviation Regulations. *See In re Air Crash Disaster at New Orleans (Moisant Field), Louisiana on March 20, 1969*, 422 F.Supp. 1166 (W.D.Tenn.1975), *aff'd*, 544 F.2d 270 (6th Cir.1976); *Crossman v. United States*, 378 F.Supp. 1312, 1318 (D.Ore.1974).

 18. Controllers are not required to foresee or anticipate the unlawful, negligent or grossly negligent acts of pilots. *See In Re Air Crash at Metropolitan Airport*, 619 F.Supp. 13, 20 (E.D.Mich.1984); *Colorado Flying Academy, Inc. v. United States*, 506 F.Supp. 1221, 1228 (D.Col.1981), *aff'd*, 724 F.2d 871 (10th Cir.1984), *cert. denied*, 476 U.S. 1182, 106 S.Ct. 2915, 91 L.Ed.2d 544 (1986); *First of America Bank–Cent. v. United States*, 639 F.Supp. 446, 456 (W.D.Mich.1986); *Air Service, Inc. v. United States*, 18 Av.Cas. (CCH) 17,556, 17,566 (N.D.Miss.1983).

### CONCLUSION

In sum, the JFK air traffic control tower had warned the flight crew of Flight 219A of both the presence of the sanding trucks and of the icy condition of taxiway Yankee; the Port Authority NOTAM also warned the flight crew of Flight 219A of the icy condition of taxiway Yankee. The DC–10 was required to yield the right-of-way to the sanding vehicles if they encountered each other at or near the intersection of Foxtrot and 4 Left.

The United States did not breach any duty owed to Pan Am. Further, no act or omission by the United States was in any way a factor, let alone a substantial factor, in causing the incident.

Accordingly, it is Ordered and Adjudged that the plaintiff take nothing, that judgment be entered for the defendants, and that the defendants recover of the plaintiff their costs of action.